**UNITED STATES of America**
v.
**BENJAMIN MOTOR EXPRESS, Inc.**
Civ. A. No. 50–461.

United States District Court
D. Massachusetts.
Jan. 3, 1957.

Anthony Julian, U. S. Atty., Andrew Caffrey, Asst. U. S. Atty., Boston, Mass., for plaintiff.

Max Singer, S. Roy Remar, Boston, Mass., for defendant.

FORD, District Judge.

This is an action by the United States to recover alleged overcharges made by the defendant on transportation of property of the United States during the years 1943 through 1945. Payment was made upon presentation of the bills therefor by the carrier. Upon subsequent audit of the bills the United States claims that an overpayment to the carrier has been made.

Defendant is a common carrier by motor vehicle. On June 17, 1943 it submitted to the Navy Department a letter signed by one Eli Hurwitz in which it quoted rates for the transportation of ammunition, explosives and other ordnance. By its terms this was to become a binding agreement when accepted by the United States by making a shipment under its terms or otherwise. The shipments involved in this litigation were thereafter made under the terms of this offer. Defendant's only contention against the validity of the contract is its argument that Hurwitz was not an agent authorized to bind the defendant.

On the face of the rate quotation Hurwitz was described as the "authorized agent" and "office manager" of defendant. He was in fact the office manager, and during the period 1940–1948 was also a director and the clerk of defendant corporation. There was evidence that he actually did handle the making of rate quotations for defendant, and that it was a part of his duties to do so. It must be found that he had not only apparent, but also actual, authority to bind the corporation, and that the rate quotation submitted by him became, upon acceptance by the United States, a valid and binding contract between the parties.

The transportation services involved consisted in the carriage of ammunition and other related material from the United States Naval Ammunition Depot at Hingham, Massachusetts, to the United States Naval Reservation at Price's Neck, Rhode Island, on various dates during 1944 and 1945.

The general procedure followed was that on request of personnel at the Hingham Depot, defendant's trucks and drivers reported there. Drivers had to obtain identification cards and then have the trucks examined and approved by naval personnel. The average time for this operation was one hour. They then drove to various dumps within the depot where the trucks were loaded. About 50% of the time they would have to drive to the portion of the depot located in Cohasset, about five miles away, to pick up part of their load there and then return to Hingham. At times drivers had to

leave their loaded trucks at the depot over night, returning there on the next morning to take them out. The evidence on this point, however, went only to the general procedure followed. There was no evidence as to exactly what was done as to any particular shipment, and the shipments involved in this action were only part of a larger number of shipments carried by defendant for plaintiff during these years.

In each of the shipments involved here the point of origin was described in the bill of lading as Hingham, Massachusetts (except for one bill in which it was described as Cohasset, Massachusetts), and the destination was described as Price's Neck, Rhode Island. Price's Neck is located within the corporate limits of the city of Newport, Rhode Island. It is so shown on the official map prepared by the city engineer and on maps issued by the United States Geological Survey, and has been for many years assessed for tax purposes by the city of Newport. The naval installation on Price's Neck was located about five miles by motor vehicle from the railroad freight station in Newport.

The controversy here concerns the proper rates to be charged for these shipments. The governing provision of the contract, as contained in defendant's rate quotation of November 17, 1943, reads as follows:

"Item No. 2. *Rates to be Applied.*

"Rates as found in tariffs: New England Motor Rate Bureau Inc. & Middle Atlantic States Motor Carrier Conference Inc., but not to exceed the applicable railroad rates for the same quantity between the same points."

It is the government's position that the charge that could be made for these shipments is limited by the applicable railroad rate of 41 cents per hundred pounds for this class of commodity from Hingham to Newport. Defendant contends that the shipments were properly billed at the rate of $1.49 per hundred pounds, the applicable rate in the tariff of New England Motor Rate Bureau Inc.

Defendant's argument seems to be the following. The government could not have obtained from a railroad exactly the same service rendered by defendant. At Hingham the railroad would have furnished cars on a siding just outside the ammunition depot. It would have carried the cars only as far as the Newport railroad station which is five miles from the naval installation at Price's Neck. The government would have had to use its own personnel and vehicles, or would have had to hire another carrier to transport the ammunition from the various dumps to the siding in Hingham and from the station in Newport to Price's Neck. Hence, the railroad rate from Hingham to Newport was inapplicable, and there being no applicable railroad rate, the motor carrier rate used by defendant was the only one which could properly be used.

The real issue then is the proper interpretation of the contract provision that rates were not to exceed "the applicable railroad rates * * * between the same points." The contract itself offers no further specific explanation of the meaning of the term "points". In the motor transportation industry, however, the words "point" is generally understood as meaning for rate purposes the entire geographical area within the corporate limits of a city or town. Hence transportation of freight between the ammunition depot in Hingham, and the installation at Price's Neck, within the corporate limits of Newport, would be transportation between the points Hingham and Newport. Since there is a railroad freight rate for shipments from Hingham to Newport it would be applicable here, and would fix the maximum rate to be charged for the shipments in question.

Freight shipments by railroad and by motor carrier are, of course, not exactly comparable, since a railroad, by the nature of its facilities, is limited to transportation of freight between locations on its existing tracks while a motor carrier has greater flexibility as to the exact location at which it can pick up or deliver

freight. Defendant's contention would limit the use of railroad rates to those cases where the motor carrier's trucks picked up and delivered freight at a railroad freight yard or siding since only then would it be giving exactly the same service a railroad would give. Such an interpretation would deprive the contract provision as to use of railroad rates of most of its meaning. It seems unlikely that the parties in including the provision would have considered it as being applicable only on such infrequent occasions. The parties here were contracting for motor carrier service and not for railroad service. The railroad rate was chosen, not as measuring the service to be rendered, but merely as fixing the reduced rate for motor carrier service for which the United States was bargaining. Southern Railway Co. v. United States, 322 U.S. 72, 64 S.Ct. 869, 88 L.Ed. 1144. The reasonable interpretation of the contract is that it requires the motor carrier to furnish motor carrier service but at a rate no higher than the rate at which a railroad would furnish railroad service between the same cities or towns.

This interpretation is supported by the fact, as testified by the government's rate expert, that of several hundred motor carriers who have had similar rate agreements with the government, only two have tried to avoid applying railroad rates in accordance with the government's interpretation of the provision. Moreover, there were more than one hundred instances of shipments like those involved here carried by defendant from Hingham to Price's Neck, for which the defendant here billed the government at the 41 cents railroad rate.

■ There was nothing unlawful in the fact that by virtue of this contract the United States secured a lower rate than other shippers. 49 U.S.C.A. § 22 (made applicable to motor carriers by 49 U.S.C.A. § 317(b) ) provides that "Nothing in this chapter shall prevent the carriage, storage, or handling of property free or at reduced rates for the United States * * *." Defendant has advanced nothing in support of its contention that "property" here should be given a restricted meaning which would not include the ammunition and ordnance materials it carried for the United States. As it stands, the section is broad enough to include property of all kinds.

For the 95 shipments involved in this case the United States has paid in accordance with the bills presented by defendant the amount of $41,313.77. The proper amount, based on the applicable railroad rate of 41 cents, was $12,148.83. Hence there has been an overpayment of $29,164.94, which the United States is entitled to recover.

Apart from the question of the interpretation of the contract defendant seems further to advance the argument that it would be inequitable to hold it to the terms of the contract. The contract, however, was freely entered into by the parties. It was the defendant which made the offer which upon acceptance became the contract. There was no evidence of fraud on the part of the government. It cannot be contended that the defendant was mistaken as to the proper interpretation of the contract, since as to over 100 shipments similar to those here involved it properly billed the United States at the proper railroad rate of 41 cents. Moreover, if, at any time it felt that the contract failed to provide proper compensation for the services it was rendering, it could, under the terms of the contract, have cancelled the quotation by a sixty-day written notice. Finally, there was evidence from the defendant's treasurer that the actual cost to defendant of one round trip of a tractor trailer from Hingham to Newport was about $77, or a total of $7,315 for these 95 trips, for which, under the contract, defendant is entitled to a compensation of $12,148.83.

Defendant further contends that it performed extra services for the United States in addition to what was actually shown on the bill of lading. However, the sole issue in this action is whether defendant was overpaid for the services rendered under the contract. Payment

was made on the basis of the bills of lading for these 95 shipments, signed by defendant's driver in each instance, and used by defendant as its sole basis for its claim for the payments it has received. It does not appear that the defendant has at any time submitted any claim for payment for services other than those shown on the bills of lading, or has ever presented any documentary evidence in support of such a claim. The evidence presented at this trial as to the procedures followed on these shipments and the nature of the services rendered was evidence only as to what was done generally in relation to some of the shipments made. There was nothing to show that it was specifically applicable to any specific shipment involved here, and hence there is no basis for any finding that as to any of these shipments defendant was entitled to any compensation for additional services.

Judgment for the United States in the amount of $29,164.94, with interest and costs.