**LOUISIANA & ARKANSAS RAILWAY COMPANY, Appellant,**

**v.**

**EXPORT DRUM COMPANY, Inc., Appellee.**

**No. 21899.**

United States Court of Appeals Fifth Circuit.

April 13, 1966.

Rehearing Denied June 6, 1966.

[redacted]

Guy C. Lyman, Jr., W. E. Davis, Elizabeth R. Haak, New Orleans, La., for appellant, Milling, Saal, Saunders, Benson & Woodward, New Orleans, La., of counsel.

Raymond H. Kierr, New Orleans, La., for appellee.

Before GEWIN and COLEMAN, Circuit Judges, and McRAE, District Judge.

McRAE, District Judge:

This action was brought under the provisions of the Interstate Commerce Act by the Louisiana & Arkansas Railway Company ("Railway Company"), which sought to recover portions of freight charges that Export Drum Company, Inc. ("Export Drum"), had refused to pay. Involved were twenty-two shipments of old, used steel drums from points in Texas and Tennessee to Baton Rouge, Louisiana.

The district court found that the Railway Company was entitled to the higher rate on the Tennessee shipments and awarded it $1,918.34, together with interest from the date of judgment, but the court did not allow recovery on the Texas shipments. From that judgment, the Railway Company appeals, alleging as error the denial of recovery on the Texas shipments and the denial of interest on the Tennessee shipments from the dates of shipment to the date of judgment.

With regard to the Texas shipments, the district court held that the shipper, Export Drum, was entitled to a preferential rate since it met the requirements of Note 18, Item 9552 of Supplement 3 to Uniform Freight Classification No. 3, which provides as follows:

(a) Ratings apply only when the immediate preceding transportation of the filled containers or cores to the shipping point of the empty containers or cores was by railroad freight service or by joint railroad freight service in connection with water service, subject to paragraph (c), OR;

When the destination of the empty. containers or cores is a point from which the filled containers or cores moved by railroad freight service or by joint railroad freight service in connection with water service, subject to paragraph (c);

(b) Identity of containers or cores will not be required but a record, subject to verification by authorized representative of the carriers, must be maintained of the filled containers or cores received or forwarded and the empty containers or cores returned.

(c) Consignor or consignee of empty containers or cores must furnish carriers' agent certificate in the form below:

CERTIFICATE

This is to certify that the filled containers (or cores) which are returned empty consist of not more than an equal number of the kind and size of the filled containers (or cores); that the filled containers (or cores) were received by railroad freight service or by joint railroad freight sevice in connection with water service, or the destination of the empty containers (or cores) is a point from which the filled contain-

ers (or cores) moved by railroad freight service or by joint railroad freight service in connection with water service.

It was stipulated by the parties that the empty drums transported from Dallas, Texas, had been shipped to Texas in a filled state by railroad freight service, but shipment had been to a GMC plant at Arlington, Texas, some 12 to 25 miles from Miller Yard, the Dallas shipping place. Export Drum transported the drums in its trucks from the GMC plant to Miller Yard.

It was stipulated further that the only records kept by Export Drum in connection with the requirements of Note 18(b) were bills of lading for each shipment of empty drums. These bills of lading bore the following inscription: "This certifies that these steel drums were received filled in railroad freight service."

On the basis of these uncontested facts, the Railway Company alleges noncompliance with all three parts of Note 18: it urges that Miller Yard in Dallas is not within the same "shipping point" as Arlington, Texas, that Export Drum failed to maintain adequate records, and that the certifications of prior railroad shipment on the bills of lading were not sufficient.

■ Before reaching the merits of these contentions, however, we are faced with the problem whether, under the doctrine of primary jurisdiction, we first must allow the Interstate Commerce Commission to construe the tariffs in dispute. Although this issue apparently was not raised by counsel for either party at any stage in the proceedings, we must apply the doctrine if it is applicable, for, being a question of the proper allocation of business between the courts and administrative agencies, it is not subject to waiver.

Until recently, the doctrine of primary jurisdiction rarely would be invoked in a case involving the construction of a railroad tariff. "[W]hat construction shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute." Great No. Ry. v. Merchants' Elevator Co., 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922). Only when the words in dispute are used in a technical sense, requiring extrinsic evidence to determine their meaning, would initial resort to the Commission be required. Id. at 291–92, 42 S.Ct. 477.

In 1956, however, the Supreme Court seemed to expand the category of cases where primary jurisdiction would be applicable. Although purporting to adhere to the distinction drawn in *Great No. Ry.*, supra, the Court held that where the construction of a tariff requires an "examination of the underlying cost-allocation which went into the making of the tariff in the first instance" and therefore where "the questions of construction and reasonableness [of the tariff] are so intertwined that the same factors are determinative on both issues, then it is the Commission which must first pass on them." United States v. Western Pac. R.R., 352 U.S. 59, 69, 77 S.Ct. 161, 168, 1 L.Ed.2d 126 (1956). Because all tariffs rest to some extent on cost factors and most tariff interpretations imply some question of reasonableness, and in light of the decision in a companion case to *Western Pac. R.R.*, supra, one commentator has expressed great alarm at the trend that he believes is indicated by the case. See Jaffe, Primary Jurisdiction, 77 Harv.L.Rev. 1037, 1043–47 (1964).

■ Whether or not this alarm is justified, we need not say; for even if the category of cases to be initially decided by the Commission has been expanded, we do not believe that this case falls within that group. The major dispute here is over the meaning of the words "shipping point" and "a record." It is true that the Commission previously has neither construed these provisions nor indicated their purpose. Both parties, furthermore, believed it necessary at the trial to have experts testify to the meaning of the words "shipping point." But the reasonableness of the rates is not in question; the purpose of the tariff is

clear, even to laymen; and if any tariff can be construed without reference to the underlying cost-allocation factors, this is one. Under these facts, courts are as competent as the Commission to interpret the tariff.

■ Having decided that this Court may initially consider the question of tariff construction, we now turn to the merits of the controversy. As previously stated, the Railway Company contends that Export Drum failed to meet any of the requirements of Note 18. Export Drum is entitled to the lower rate, of course, only if all of them were met.

■ With regard to the requirement of part (c) of Note 18 that the shipper must furnish a certificate of prior railroad freight service, the Railway Company concedes that Export Drum's certificate contained the substance of the Note's language and can suggest no purpose that would be served by requiring the precise language of the Note. In clear language, Export Drum certified that the drums now being shipped had been received filled in railroad freight service. No more is required.

■ Parts (a) and (b) present more difficult problems. The pertinent language of part (a) is as follows: "Ratings apply only when the immediate preceding transportation of the filled containers * * * to the shipping point of the empty containers * * * was by railroad freight service * * *." In other words, the container must be full when transported to the shipping point of the empty containers, and the transportation must be by railroad freight service. Thus, since the filled containers involved in this dispute were shipped to Arlington, Texas, but the empty containers were shipped from Miller Yard, Dallas, Texas, the key question is whether Arlington is part of the same shipping point as Miller Yard. We think it is.

Although never having construed the tariff in question or any analogous one, the Interstate Commerce Commission has held that for rate purposes the term "point" means more than a street address or shipper's platform; rather, it encompasses at least the entire city. See Amer-

ican Iron & Mach. Works v. Akron, C. & Y. R. R., 296 I.C.C. 737, 741 (1955); Charles Dixon Livestock Comm'n Co. v. Chicago, R. I. & Pac. R. R., 288 I.C.C. 107, 109 (1953); cf. United States v. Benjamin Motor Express, Inc., 147 F. Supp. 15 (D.Mass.1957), aff'd, 251 F.2d 547 (1st Cir. 1958) (trucking industry).

■ A similarly broad definition of the phrase "shipping point" in the tariff under consideration here would be entirely consistent with the tariff's purpose. Indeed, to limit it to the city limits of Dallas would be too narrow. The obvious purpose of the tariff is to provide incentive to shippers to use the railroad rather than the trucking industry. If shipment in is by rail, then shipment out by rail may be obtained at a reduced rate. When, as here, the unloading and loading platforms are within the same commercial area and so close to each other that the same rate is applicable from either place to the designated destination, both platforms should be deemed to be within the same "shipping point." All long-distance travel was by rail, the very purpose of the tariff, and, as long as the rates are identical from either place, the railroad is financially in the same position.

■ The only possible harm to the railroad in adopting this definition of "shipping point" is that the trucking industry may be benefited, having obtained some business on the short-haul transfer from the unloading to the loading platform. In this case, transfer was by Export Drum's own trucks, but even if an outside trucker had been hired, the same conclusion would be reached. Any benefit would be minimal and no more than that received from a transfer between two places within the same city.

Under the facts of this case, therefore, we hold that the platform at Arlington, Texas, lies within the same "shipping point" as Miller Yard, Dallas, Texas; the requirements of part (a) of Note 18 are satisfied.

In order that the railroad can determine more easily that the requirements of part (a) have been fulfilled, part (c) requires a certification of prior railroad

**316**

freight service, and part (b) requires that "a record, subject to verification by authorized representative of the carriers, must be maintained of the filled containers or cores received or forwarded and the empty containers or cores returned."

▇▇▇ Export Drum maintained on file the bills of lading on the *empty* containers it had shipped from Dallas. But Export Drum did not maintain any record of filled containers received unless the part (c) certifications placed on these bills of lading also can constitute such a record. They cannot. Each provision of a tariff, as each provision of a contract, should be given effect if it is logical and reasonable to do so. To allow the part (c) certification also to constitute part (or, in another case, possibly all) of the records required by part (b) would read the latter provision out of the tariff. More important, the purpose of part (b) is to provide objective evidence, easily obtainable, of the conclusions stated in the certificate required by part (c). Thus, although the ultimate purpose of the two parts may be the same, they do serve different functions and require different papers.

This conclusion, however, does not settle the matter. Although part (b) requires that a record be maintained, it does not state who shall maintain the record. The GMC plant that received the filled drums quite possibly has sufficient records on the incoming shipments; if it does, these records, along with the bills of lading kept by Export Drum on the shipments of empty drums, would provide enough objective evidence to enable the railroad to verify the part (c) certificates furnished by Export Drum.

But this procedure, we believe, would place a relatively unfair burden on the railroads. It is to the shipper's benefit to receive the lower rates, and it would not be burdensome to the shipper for it to obtain records from the receiver of the filled drums and maintain them if the shipper wished to take advantage of the lower rate. On the other hand, if the shipper of the empty drums was not required to maintain a record of the filled

containers received and if a shipment of empty containers consisted of drums received from many companies (and not just one as in the present case), it would be quite difficult and time consuming for the railroad to visit the offices of the various companies as well as the office of the shipper. Not only is the purpose of Note 18(b) best satisfied by requiring the shipper to maintain all the records, but the language of the tariff, using the word "record" rather than "records," supports the same conclusion.

▇▇▇ Assuming, *arguendo*, that a waiver of parts (b) and (c) could be effected, the requirement of maintaining an adequate record was not waived by the Railway Company when it stipulated that the empty drums shipped from Texas were received filled in prior railroad freight service. As we have seen, part (b) seeks to provide a means whereby the carrier can easily determine the validity of the shipper's certificate of prior railroad freight service. But with the records not being kept by the shipper, the Railway Company may have had to expend considerable effort to determine the facts in this case. Of course, once the facts were determined, it was only natural for a stipulation to be entered into, under the normal federal practice. To find a waiver of rights in this cause not only would tend to defeat the purpose of part (b), but also would tend to limit stipulations in future cases, a highly undesirable result.

▇▇▇ By its failure to meet the requirements of part (b) on the Texas shipments, Export Drum is not entitled to the lower rate under Note 18. Judgment for an additional $564.95 plus interest should be entered, therefore, in favor of the Railway Company.

The remaining problem before us is the date from which interest should start running. The appeal on interest was taken on the court's ruling regarding the Tennessee shipments; but now, of course, our holding will apply equally to the award made on the Texas shipments.

▇▇▇ Export Drum's major argument in favor of the district court's ruling allowing interest only from the date of

judgment rests on the provisions of 28 U.S.C. § 1961, which state in pertinent part as follows: "Interest shall be allowed on any money judgment in a civil case recovered in a district court. * * * Such interest shall be calculated from the date of the entry of the judgment, at the rate allowed by State law." It is settled, however, that § 1961 relates only to interest recoverable on a judgment itself. It has nothing to do with the question of whether prejudgment interest shall be allowed *as part of the compensation awarded to make the injured party whole.* Midstates Oil Corp. v. Waller, 207 F.2d 127 (5th Cir. 1953); Moore-McCormack Lines, Inc. v. Amirault, 202 F.2d 893 (1st Cir. 1953).

█ Both the Interstate Commerce Act and I.C.C. regulations are silent on the question of whether prejudgment interest should be allowed. Nevertheless, the question is initially one of federal law, being a part of the determination of the proper remedy for enforcement of tariffs established by authority of the Interstate Commerce Act. Cf. 1A Moore, Federal Practice ¶0.323 [22], at 3755 (2d ed. 1959). Moreover, since at the bottom of the problem is the implementation of an overall national transportation policy concerning interstate shipments, with no state policies involved or interfered with, federal law should not refer to state law for a determination of the issue. Rather, one rule of federal decisional law should be established for all shipments regardless of where they occur. If this federal rule requires prejudgment interest, resort then should be had to state law, as a matter of convenience and practicality (as does § 1961), for the amount of the interest.

█ We believe that prejudgment interest should be allowed. In this case, a sum certain is in controversy. As the common law recognizes in analogous situations, the only way the wronged party can be made whole is to award him interest from the time he should have received the money. At the conclusion of the dispute, the parties should be in the same position regardless of whether the shipper does not pay the disputed amount, as here, and the carrier is forced to sue, or whether the shipper pays and then sues for an overcharge.

█ Existing case law supports this position. The Supreme Court long ago recognized the Interstate Commerce Commission's general practice of including interest from the date of payment in a reparation award on charges unlawfully exacted and upheld the propriety of such practice. See Louisville & N. R. R. v. Sloss-Sheffield Steel & Iron Co., 269 U.S. 217, 238–240, 46 S.Ct. 73, 70 L.Ed. 242 (1925). Whether or not the Commission in its discretion might be able to refuse to award such interest, we hold that in actions initiated in the federal district courts for undercharges on freight shipments, interest from the time the money is due (the date of shipment) is a mandatory element of the damages. Accord, Fawley Motor Lines v. Cavalier Poultry Corp., 235 F.2d 416 (4th Cir. 1956); T. & M. Transp. Co. v. S. W. Shattuck Chem. Co., 158 F.2d 909 (10th Cir. 1947).

Accordingly, compensatory prejudgment interest should be awarded the Railway Company from the dates of shipment to the date of the judgment on both the Texas and Tennessee shipments, and, in accordance with 28 U.S.C. § 1961, interest also should be awarded on the judgment from the date thereof.

The judgment entered below is reversed and this cause is remanded for entry of a judgment for appellant not inconsistent with this opinion.

## ON MOTION FOR LEAVE TO FILE TYPEWRITTEN PETITION FOR REHEARING AND ON PETITION FOR REHEARING

PER CURIAM:

1. Appellee's motion for leave to file typewritten petition for rehearing is granted.

2. Appellee's motion for rehearing is denied. The Court takes note of the signed stipulation of the parties incorporated in the District Judge's findings of fact which refutes the appellee's argument that it kept adequate records before such records as it did keep were destroyed by fire.