Jean Whitehouse **RAMEY**,
Plaintiff-Appellee,

v.

The **CINCINNATI ENQUIRER, INC.**,
and American Financial Corporation,
Defendants-Appellants.

Angiolina **MORELLI**,
Plaintiff-Appellee,

v.

The **CINCINNATI ENQUIRER, INC.**,
and American Financial Corporation,
Defendants-Appellants.

Albert **HARRIS**, Plaintiff-Appellee,

v.

The **CINCINNATI ENQUIRER, INC.**,
and American Financial Corporation,
Defendants-Appellants.

Jean W. **RAMEY** et al.,
Plaintiffs-Appellees,

v.

The E. W. **SCRIPPS COMPANY** et al.,
Defendants-Appellants.

Cecil F. **SCHOEN**, a.k.a. Cecile F.
Schoen, Plaintiff-Appellant and
Cross-Appellee,

v.

The **CINCINNATI ENQUIRER, INC.**,
et al., Defendants-Appellees and
Cross-Appellants (3 cases).

Nos. 74–1110 to 74–1116.

United States Court of Appeals,
Sixth Circuit.

Dec. 26, 1974.

Court erred in refusing to award attorney fees to the defendant is without merit.

cinnati, Ohio, for appellants in Nos. 74–1110 to 74–1113.

Jerome Goldman, Douglas G. Cole, C. R. Beirne, Cincinnati, Ohio, for appellee in No. 74–1110.

Arnold Morelli, Cincinnati, Ohio, for appellee in No. 74–1111.

Irving Harris, Cincinnati, Ohio, for appellee in No. 74–1112.

James W. Henglebrok, Cincinnati, Ohio, Richard F. Stevens, H. Stephen Madsen, Baker, Hostetler & Patterson, Cleveland, Ohio, for appellants in Nos. 74–1114, 74–1115 and appellees in No. 74–1116.

C. R. Beirne, Cincinnati, Ohio for appellees in No. 74–1114.

Ambrose H. Lindhorst, Gene Mesh, Cincinnati, Ohio, David C. Bayne, Professor of Law University of Iowa College of Law, Iowa City, Iowa, for appellees in No. 74–1113.

Ambrose H. Lindhorst, Gene Mesh, Cincinnati, Ohio, for appellees in No. 74–1115 and appellants in No. 74–1116.

Before PHILLIPS, Chief Judge, and EDWARDS and McCREE, Circuit Judges.

PHILLIPS, Chief Judge.

These are appeals from an order granting attorneys' fees in four stockholder derivative suits that were dismissed on grounds of mootness after trial but before adjudication. The District Judge's order awarded a total of $865,000 in attorneys' fees and $35,115.96 in expenses to be paid to plaintiffs' attorneys in four cases by defendants Enquirer[1] and Scripps,[2] with a contribution of $145,375.00 on the part of the minority shareholders to be paid by American Financial Corporation.[3]

This litigation had its genesis in an antitrust action filed against the E. W. Scripps Company by the Department of Justice in 1964. The Scripps-Howard in-

John A. Lloyd, Jr., Frost & Jacobs, John L. Muething, Louis F. Gilligan, Cin-

1. Enquirer in this opinion will refer to the Cincinnati Enquirer, Inc., the owner of the newspaper, *The Cincinnati Enquirer.*

2. Scripps or Scripps-Howard will be used in this opinion to refer to the Scripps group of

defendants, consisting of the E. W. Scripps Co., Scripps-Howard Investment Co. and Jack Howard.

3. Subsequently American Financial or AFC.

terests, while owning Cincinnati's only evening newspaper, *The Cincinnati Post and Times Star,* also acquired the majority interest in the stock of *The Cincinnati Enquirer,* Cincinnati's only morning newspaper. The antitrust action was tried before the same District Judge who rendered the judgment involved in the present appeal and was terminated by a consent decree requiring that Scripps divest itself within 18 months of its controlling interest in the Enquirer.

Early in 1970 the management of the Enquirer, ultimately supported by a majority of the minority shareholders, put together a bid to Scripps-Howard to purchase Scripps-Howard's 60 per cent share of the Enquirer stock. A stock acquisition agreement was signed which provided that the Enquirer would purchase all of the Enquirer stock owned by Scripps-Howard at $35 per share, 11½ million dollars to be paid in cash and the balance to be paid by the issuance of 60,000 shares of preferred stock.

The details of the plan and its proposed financing by the Prudential Life Insurance Co. of America were as follows:

1) The Enquirer would purchase directly from the Scripps group 330,558 Enquirer shares at $35 a share, totalling $11,569,530.

2) Of this sum the Enquirer was to borrow $10,500,000 from the Prudential Life Insurance Co., to be repaid at 12 per cent interest over 16 years.

3) The balance of 171,428 shares owned by the Scripps group would be purchased by the Enquirer by issuance and exchange of 60,000 newly authorized shares of convertible preferred stock that Scripps then agreed to sell (and Prudential by separate contract agreed to buy) for $6,000,000 in cash. The Enquirer would be obligated to pay a yearly dividend of $7.65 on each share of preferred stock and to redeem a minimum of 3,000 shares a year at $110 per share.

4) Under this arrangement the Prudential Life Insurance Co. would have invested $16,500,000, on which the Enquirer would be required to pay a return of 12 per cent on the loan and about ten per cent on the preferred stock. On default of the Enquirer's obligation on either the preferred stock or the debt, Prudential could acquire the entire assets of the Enquirer.

5) The Enquirer was able to contribute only one million dollars from its working capital to accomplish this purchase.

6) The redemption of preferred stock, plus the interest on the loan, would equal about one and one-half million dollars a year. Previously the Enquirer had been netting about two million dollars each year after taxes.

7) No provision was made for any offer to the minority stockholders of the Enquirer. At a stockholders' meeting on October 23, 1970, the stock acquisition plan described above was approved by a vote of 222,930 to 75,307, with the Scripps' 60 per cent of the shares not voting.

In October 1970 three stockholders' derivative suits (Ramey, Morelli and Harris) were filed to set aside this stock purchase plan, alleging, among other things, that the proxy statement contained untrue and misleading statements of material fact and that the plan violated various provisions of both federal and Ohio law.[4] Two of these suits (Ramey and Morelli) were filed before the stockholders' meeting and resulted in the order of the District Court on October 22 enjoining the execution of the purchase agreement until further order. The derivative action of Harris was filed on October 26. Later in November an action was filed on behalf of a stockholder named Schoen. This suit also attacked the acquisition agreement, essentially contending that the proposed transaction was fraudulent.

---

**4.** *E. g.,* §§ 10(b) and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(a) (1970), and the rules thereunder, 17 C.F.R. §§ 240.10b–5, 240.14a–9 (1974); Ohio Rev.Code Ann. § 1701.35 (Page's Supp. 1973).

The cases were tried for about two months, concluding January 18, 1971. Ten days after the trial and before any opinion had been announced, the litigation was mooted when Scripps, making use of an escape clause in the acquisition agreement, terminated its proposed deal with the Enquirer group. This termination by Scripps was prompted by a bid of $35 a share (the same figure as the Enquirer bid, but extended to all minority shareholders) from a California-based trading stamp company called Blue Chip Stamps. Thereafter, and before the court had acted on a petition by the United States and the Enquirer to require the Scripps group to extend the Enquirer agreement, the American Financial Corporation offered Scripps-Howard $40 per share for its 60 per cent interest in the Enquirer's stock and offered the same amount per share to all of the minority shareholders. This offer was accepted by Scripps-Howard. AFC proceeded to acquire the entire Scripps-Howard interest and ultimately all of the minority shares.

The District Judge subsequently issued an informal opinion disclosing the findings of fact that he would have made and the conclusions of law that he would have entered had the case not been mooted. He then heard and decided the requests by the different attorneys for attorneys' fees.

In his fee opinion, the District Judge described the Enquirer-Scripps deal, as originally proposed, in the following language:

"However, it is to be noted that the transaction would have changed the Enquirer stock from 'safe' to 'risky' or 'high leverage.' And the Enquirer-Scripps deal was accurately described as 'thin.' As stated by one of the Enquirer directors, it was no deal for 'widows or orphans.'"

In the same opinion he also said in part:

"The purchase by a corporation of its own shares has a potential for abuse, and restrictive legislation has therefore grown up to meet the need to prevent such abuse. Hence, any time a corporation attempts to purchase its own shares, especially on a shoestring, the transaction has to be cast in a form which meets the legal requirements and a number of extremely difficult questions in the area of corporate law and finance arise. One restriction on purchase by a corporation of its own shares is the Impairment of Capital Statute, Ohio Revised Code 1701.35, which provides that after such purchase the 'debts' of the corporation must not exceed its assets plus 'stated capital.' That explains why only so much money could be borrowed from Prudential and the balance had to be raised by sale of preferred stock which could be determined to be 'equity' and not 'debt.' In this case the preferred stock had warrants, voting powers, conversion privileges, redemption and other rights, and a difficult and serious question was presented as to whether, though cast in the form of 'equity,' it was not in law and in fact 'debt.' If the shares were 'debt,' the assets of the Enquirer after the purchase of the Scripps shares would not have exceeded debts plus stated capital as required by ORC 1701.35, and the deal would have been illegal.

"That was just one of many complex questions. Another involved the corporate power and many others arose in connection with the proxy statement and the claims that statements therein were materially misleading. One of these was it was not accurate in its portrayal of the effect of the deal on the Enquirer's ability to pay dividends and its dividend policy. Another was that in describing the effect of the plan on the book value of the Enquirer stock (proxy statement, p. 6) instead of a drop from plus $15.42 per share to 'none,' the proxy statement should have shown a drop from $15.42 to minus $13.07.

\* \* \* \* \* \*

"[I]n the Enquirer case, by deciding to change stated capital as proposed from

$5 per share to $1 per share, the shareholders were saying in effect they chose to embark on the proposed corporate venture and in order to do so to completely change the capital structure of the Enquirer, eliminate the shareholders' equity, change its stock from 'safe' to 'risky,' and agreed to pay for the outstanding shares out of future earnings.

\* \* \* \* \* \*

"We also considered the commentary and the chapter on the Model Corporation Act—the commentary to § 5, 'Right of corporation to acquire and dispose of its own shares.' This points out that most statutes, like the Model Act, provide in substance that a corporation's own shares shall be purchased only out of surplus except in special situations specified in the statute. And of the many cases, one which we found noteworthy is Mountain States [State] Steel Foundries, Inc. v. C.I.R., 284 F.2d 737 (5 [4] Cir., 1960), where an impairment statute similar to Ohio's was under the glass.

"This should suffice to underline that a proposed acquisition of the Enquirer of its own shares, cast in the form it was, was not only 'thin' financially, but legally as well.

\* \* \* \* \* \*

"As to economic benefit, while there is dispute, this much can be said. If the Enquirer had purchased the Scripps shares, that is, if the plan had not been restrained, the Enquirer would have paid out $17.5 million in principal and would have lost the income on investments owned by it which had to be liquidated to apply on the purchase price of the stock in the sum of $1,026,748. In addition, the Enquirer would have obligated itself to interest payment on the loan of $15,975,000, and dividend payments on preferred stock of $4,590,000, and payment of premiums on required preferred stock redemption of $600,000, which payments would have totaled $22,191,748, in addition to the $17.5

million in principal previously stated. Also, as to economic benefit, it can be said that the *corporation,* as Mr. Goldman contended, received nothing for the $17.5 million it paid for its own stock, or would have paid. If the deal had gone through, the book value of the stock would have gone from plus to minus, and it is probable the market value would have gone way down, at least temporarily. An incidental benefit conferred on the shareholders was that in the time it took to litigate Scripps kept its option open, and along came the Blue Chip offer to all shareholders for $35 a share, and the AFC offer to all shareholders of $40 a share, the difference between $40 and $35 being about $2.5 million or more to Scripps alone.

"Nevertheless, in fixing the fee we have not gone on the assumption that there is an identifiable fund, such as the interest on the obligation to Prudential. We have concluded that as far as economic benefit and other ways this case is unique, and, while we conclude that a significant service was performed by the applicants, and there is strong evidence of economic benefit, especially in the testimony . . . ."

The District Judge then proceeded to decide the claims of the different attorneys for fees. He noted that the claims had totaled a maximum of $1,750,000. His award was less than half of that sum, $750,000, augmented by $115,000 of prejudgment interest, an item contended by appellants to be unprecedented on these facts. The District Judge also ordered that ten per cent of the fee be awarded to Mesh, the attorney for Schoen, with the balance to be divided one-third each to the three law firms representing Ramey, Morelli and Harris, respectively. He also ordered that $326,290.90 be paid by the Scripps-Howard group, $393,333.60, plus $35,115.95 expenses, by the Enquirer, and $145,375.50 by American Financial Corp., which had, by court order, withheld $2.00 a share for legal fees when it bought the shares of the minority stockholders.

The principal appellate issues appear to us to be these:

1) Did this litigation produce such a benefit for the corporation (The Cincinnati Enquirer, Inc.) as to justify the award of fees?

2) Did the District Judge abuse his discretion by awarding excessive fees?

3) Was the award of prejudgment interest legally justified?

4) Assuming attorneys' fees were justified in some sum, could they legally be awarded against any party other than the Enquirer?

5) Did the District Judge commit error in dismissing the Scripps-Howard indemnity cross-claim against the Enquirer and AFC?

### 1) The Corporate and Stockholder Benefit

The District Court's proposed findings of fact and conclusions of law in the original derivative actions found violations of state and federal laws that would have required preparation of an amended proxy statement and resubmission of the acquisition plan to the Enquirer shareholders. It is clear to this court that the District Judge made no findings of deliberate concealment or fraud. It also is clear that although appellants describe the violations found by the District Judge as "technical," nonetheless they would have served to require disclosures that would have alerted the Enquirer's minority stockholders further concerning the financial burden that their corporation was undertaking to assume.

There was testimony before the District Judge from which he could have concluded, as he did, that the Enquirer's management was proposing a high-risk plan. The cash payment of over one million dollars would have depleted the Enquirer's working capital, thereby impairing liquidity. The $16,500,000 obligation to Prudential, including the loan and the preferred stock, was about equal to the total asset value of the Enquirer. The plan would have raised the Enquir-er's debt ratio to about 90% from a relatively low 21%. It is clear that such a highly leveraged capital structure could bring about a financial disaster if the Enquirer suffered even a temporary decline in revenues. The District Judge had ample reason to doubt that Enquirer earnings could service the Prudential loan and at the same time meet the preferred stock dividend and redemption requirements. Finally, we note that the plan of acquisition would have produced no corporate benefit for the Enquirer commensurate with the substantial debt that it would have assumed.

As we see the matter, plaintiffs' derivative suits succeeded in delaying consummation of the risky repurchase plan until two other companies made offers that would have accomplished the Scripps-Howard divestiture without the adverse effect upon the Enquirer's capital structure. Further, insofar as the derivative actions exposed inaccuracies and misleading statements in the proxy materials, this litigation constituted "corporate therapeutics," which benefits both the corporation and its stockholders. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 396, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). The plaintiffs' efforts also conferred an incidental benefit upon all of the Enquirer's shareholders. Had the initial repurchase plan not been delayed, the more attractive AFC offer presumably would not have been made.

On the record before us, we cannot hold clearly erroneous the findings of the District Court that the plaintiffs' suits resulted in a substantial benefit to the Enquirer. Fed.R.Civ.P. 52(a).

We conclude that the services performed by plaintiffs' attorneys justify an award of fees, even though no fund has been brought into court and even though it may be impossible to assign an exact monetary value to the benefit conferred upon the corporation. In this respect the present case is controlled by Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), in which the Supreme Court outlined the following definitive view on the award

of attorneys' fees when no specific fund has been produced by the litigation:

"While the general American rule is that attorneys' fees are not ordinarily recoverable as costs, both the courts and Congress have developed exceptions to this rule for situations in which overriding considerations indicate the need for such a recovery. A primary judge-created exception has been to award expenses where a plaintiff has successfully maintained a suit, usually on behalf of a class, that benefits a group of others in the same manner as himself. See Fleischmann Corp. v. Maier Brewing Co., 386 U.S. [714], at 718–719 [87 S.Ct. 1404, at 1408, 1409, 18 L.Ed.2d 475]. To allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense. This suit presents such a situation. The dissemination of misleading proxy solicitations was a 'deceit practiced on the stockholders as a group,' J. I. Case Co. v. Borak, 377 U.S. [426], at 432 [84 S.Ct. 1555, at 1560, 12 L.Ed.2d 423], and the expenses of petitioners' lawsuit have been incurred for the benefit of the corporation and the other shareholders.

"The fact that this suit has not yet produced, and may never produce, a monetary recovery from which the fees could be paid does not preclude an award based on this rationale. Although the earliest cases recognizing a right to reimbursement involved litigation that had produced or preserved a 'common fund' for the benefit of a group, nothing in these cases indicates that the suit must actually bring money into the court as a prerequisite to the court's power to order reimbursement of expenses.

.      .      .      .      .

"Other cases have departed further from the traditional metes and bounds of the doctrine, to permit reimbursement in cases where the litigation has conferred a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them. This development has been most pronounced in shareholders' derivative actions, where the courts increasingly have recognized that the expenses incurred by one shareholder in the vindication of a corporate right of action can be spread among all shareholders through an award against the corporation, regardless of whether an actual money recovery has been obtained in the corporation's favor. For example, awards have been sustained in suits by stockholders complaining that shares of their corporation had been issued wrongfully for an inadequate consideration. A successful suit of this type, resulting in cancellation of the shares, does not bring a fund into court or add to the assets of the corporation, but it does benefit the holders of the remaining shares by enhancing their value. Similarly, holders of voting trust certificates have been allowed reimbursement of their expenses from the corporation where they succeeded in terminating the voting trust and obtaining for all certificate holders the right to vote their shares. In these cases there was a 'common fund' only in the sense that the court's jurisdiction over the corporation as nominal defendant made it possible to assess fees against all of the shareholders through an award against the corporation.

"In many of these instances the benefit conferred is capable of expression in monetary terms, if only by estimating the increase in market value of the shares attributable to the successful litigation. However, an increasing number of lower courts have acknowledged that a corporation may receive a 'substantial benefit' from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature.

.      .      .      .      .

"In many suits under § 14(a), particularly where the violation does not relate to the terms of the transaction for which proxies are solicited, it may be impossible to assign monetary value to the benefit. Nevertheless, the stress placed by Congress on the importance of fair and informed corporate suffrage leads to the conclusion that, in vindicating the statutory policy, petitioners have rendered a substantial service to the corporation and its shareholders." *Id.* at 391–396, 90 S.Ct. at 625–627.) (footnotes omitted.)

Moreover, the fact that these suits became moot does not preclude recovery of attorneys' fees. So long as a substantial benefit is conferred upon the corporation, it is not necessary that the litigation be brought to a successful completion. Kahan v. Rosenstiel, 424 F.2d 161, 167 (3d Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *see* Blau v. Rayette-Faberge, Inc., 389 F.2d 469, 473–474 (2d Cir. 1968).

We have no doubt that the District Court was warranted in awarding counsel fees to plaintiffs' attorneys.

### 2) Reasonableness of Fees

■ The trial judge in determining the value of services rendered by lawyers who have tried a case before him ordinarily has an infinitely better opportunity to evaluate those services than does an appellate court. Therefore, appellate courts hold that the trial judge's determinations on legal fees should not be set aside unless there is a clear abuse of discretion.

In an early case the United States Supreme Court stated this principle clearly:

"The conclusion to which we have come is that, under the circumstances of this case, the Circuit Court had the power, in its discretion, to allow to the complainant, Vose, his reasonable costs, counsel fees, charges, and expenses incurred in the fair prosecution of the suit, and in reclaiming and rescuing the trust fund and causing it to be subjected to the purposes of the trust. The allowances made for these purposes we have examined, and do not find anything therein seriously objectionable. *The court below should have considerable latitude of discretion on the subject, since it has far better means of knowing what is just and reasonable than an appellate court can have.*" Trustees v. Greenough, 105 U.S. 527, 537, 26 L.Ed. 1157 (1881) (Emphasis added.)

■ This circuit over the years has pointed out the considerations that enter into the fixing of reasonable fees by the court. They include 1) the value of the benefit rendered to the corporation or its stockholders, 2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others, 3) whether the services were undertaken on a contingent fee basis, 4) the value of the services on an hourly basis, 5) the complexity of the litigation, and 6) the professional skill and standing of counsel involved on both sides. Denney v. Phillips & Buttorff Corp., 331 F.2d 249 (6th Cir.), cert. denied, 379 U.S. 831, 85 S.Ct. 61, 13 L.Ed.2d 39 (1964); Pergament v. Kaiser-Frazer Corp., 224 F.2d 80 (6th Cir. 1955); In re Detroit Int'l Bridge Co., 111 F.2d 235 (6th Cir. 1940).

*Denney* presents a fact situation quite similar to the instant case in that no cash fund ever was developed from which fees could be paid:

"The derivative action concerned the purchase by the respondent of 60,000 shares of stock, owned by the controlling stockholders, in Wm. R. Moore Dry Goods Company for $2,700,000. While the derivative action was pending and before it was assigned for trial, the officers and directors rescinded the purchase of the Moore stock. On the former appeal we held that the purchase of the stock, at least, constituted constructive fraud. On remand we instructed the District Court to require the defendants (officers and directors of the respondent) to pay to the respondent interest on $2,700,000 from the date of the commencement of the action to the date of rescision and to fix attorneys' fees for the peti-

tioners. We held that the fact that the defendants rescinded the transaction before the court had an opportunity to pass upon the merits of the case would not defeat the right of counsel to compensation.

"The trial judge entered judgment for interest in the sum of $40,800. Counsel for the respondent claim that this was the only fund recovered for the corporation. They further claim that under Tennessee law an allowance of attorneys' fees must be limited to an amount commensurate with this recovery. In support of this theory, counsel cite Southern v. Beeler, Atty. Gen., 183 Tenn. 272, 195 S.W.2d 857. More relevant to the issue in this case is Grant v. Lookout Mountain Co., 93 Tenn. 691, 28 S.W. 90, 27 L.R.A. 98. There the court held that since the minority stockholders by their action had benefited the corporation, it was therefore responsible for proper and reasonable attorneys' fees. The court further determined that the attorneys were entitled to a lien for their fees upon the land conveyed by the deeds which were canceled by the action of the minority stockholders.

"It cannot be said that the cancellation of the purchase of the Moore stock did not result from the action of the minority stockholders. Its cancellation inured to the benefit of the corporation by restoring $2,700,000 in assets in lieu of the Moore stock. After the rescission of the purchase of the Moore stock, or its resale, the trial judge entered an order impounding $270,000 of the corporation's funds out of which attorneys' fees might be paid. This order was made without prejudice to the contentions of any of the parties.

"The court granted judgment in favor of the petitioners for $235,000 attorneys' fees and for $6,227.98 expenses. The trial judge found that the

services were of vast proportions and that they were effective. He took into consideration the time spent by the lawyers, the complexity of the legal questions involved, the results accomplished, the professional standing of petitioners, and the professional standing of respondent's lawyers. He viewed the transaction in its entirety based upon all the facts in the case. The judge also took into account the public policy aspect to stockholders' derivative actions, i. e., that they serve a good purpose and should be encouraged rather than discouraged." *Id.* 331 F.2d at 250–251.

The District Judge in the instant case found on substantial evidence that this was difficult and complex litigation, that the public had a stake in this and similar litigation, that the lawyers on both sides were competent and of high standing in their profession, and that plaintiffs' lawyers had contingent agreements that could not possibly compensate them (or encourage others) in relation to the services performed.

On the subject of amount of fees, the plaintiffs relied upon three witnesses, Mr. Jerome Goldman, Mr. James D. St. Clair, and Mr. Henry P. Jeffrey—all capable and experienced attorneys of excellent reputation. Their opinions as to fees earned in the subject litigation were $1,750,000, $1,500,000 and $1,250,000, respectively.

■ It does not appear to this court that the defendants ever really anticipated escaping from payment of substantial attorney fees.[5] They called as expert witnesses the Honorable Earl Morris, former President of the American Bar Association, and Mr. Thomas Conlan, a prominent member of the Cincinnati Bar. Morris' total estimate of an appropriate fee was just under $400,000 and Conlan's was $465,000. While the $750,-000 awarded by the District Judge exceeds the defendants' estimates, it is ap-

---

5. The District Judge said on this point:

"As the Court understands it, there is no dispute among the parties that the attorneys are entitled to fees. There is a dis-

pute as to the amount to which they are entitled. In any event we conclude that the applicants are entitled to substantial fees and expenses herein."

proximately half of the plaintiffs' claims. As we have pointed out, the District Judge found that defendants' benefit from this litigation was substantial. He did not pin a specific figure upon the benefit, but he had before him testimony that would have allowed a finding of between $7,500,000 and $17,500,000. We find no abuse of discretion in the District Court's award of the sum total of fees.

We have considered the subsidiary argument between the attorneys for plaintiffs in the consolidated cases, who had stipulated to an equal division of fees between three firms representing Ramey, Morelli and Harris, and attorney Mesh in the Schoen case. Similarly, we find no abuse of discretion, and no basis in law or fact for either setting aside or increasing the ten percent of the total fee awarded to Mesh, the attorney for plaintiff Schoen.

### 3) Prejudgment Interest

■ This court, however, finds no legal grounds for the $115,000 award of "prejudgment interest." The District Court said:

"In fixing the amount of the award now the Court must also take into account the fact that it should have been fixed sixteen months ago, and would have been but for the fact that the Enquirer's application to have Scripps pay part or all of the fee was delayed and much time was taken to try to get the matter settled.

"As a result the Enquirer and AFC have had use of the money, and, in that connection, a representative of AFC testified that they expected to make 15% per annum from their capital. The money paid into a fund at the Court's direction when AFC offered to buy the minority shareholders has been on interest."

We recognize that some courts have regarded prejudgment interest as being justified by the need for adequate compensation so as to make the injured party whole. See United States v. Michael Schiavone & Sons, Inc., 450 F.2d 875 (1st

Cir. 1971); Louisiana & Arkansas Ry. v. Export Drum Co., 359 F.2d 311 (5th Cir. 1966).

In the instant case, however, we feel that the attorneys involved have been compensated amply for their services by the District Judge's fee award. Obviously, the District Judge allowed fees based not on quantum meruit alone but in substantial part upon the favorable results of their labors. As we have noted, he made no findings of fraud or overreaching that might justify punitive damages. We find no evidence of dilatory tactics or purposeful delay on the part of defendants.

In the instant case the attorneys' fees ultimately allowed were not a liquidated sum or a sum certain until the entry of the District Court's judgment for fees filed on October 10, 1973. In a recent case the Ninth Circuit stated:

"True, claims for 'reasonable' attorneys' fees, being unliquidated until they are determined by a court, are not entitled to pre-judgment interest as would be certain liquidated claims. But once a judgment is obtained, interest thereon is mandatory without regard to the elements of which that judgment is composed. Cf. United States v. Michael Schiavone & Sons, Inc., 450 F.2d 875 (1st Cir. 1971)." Perkins v. Standard Oil Co., 487 F.2d 672, 675 (9th Cir. 1973).

The judgment of the District Court is modified to allow interest on the award of $750,000 in fees from October 10, 1973.

### 4) Liability for the Attorneys' Fees

We now turn to the question of whether the attorneys' fees can be awarded legally against any party other than the Enquirer.

This appeal grows out of derivative actions filed on behalf of the Enquirer by four of its minority stockholders. The Enquirer itself was named as a nominal defendant, but the real defendants were Scripps-Howard and individual officers and directors of the Enquirer. As the Ramey complaint makes clear, it

was a corporate right of the Enquirer that the suits sought to enforce:

> "This action is filed on behalf of Enquirer for its benefit and the benefit of its shareholders as a shareholder's derivative action to enforce a right and cause of action of Enquirer which should be enforced by said corporation, but on which said corporation refuses to act because it is being prevented from so doing by the Board of Directors of Enquirer . . .."

Thus it appears that this case presents typical derivative actions within the meaning of the conventional hornbook definition:

> "In legal effect, a stockholders' suit is one by the corporation conducted by the stockholder as its representative. The stockholder is only a nominal plaintiff, the corporation being the real party in interest.
>
> "The suit is a derivative one, and is to be distinguished from a representative action brought by a stockholder as an individual and for his own benefit in behalf of himself and other stockholders similarly situated. Where plaintiff does not seek to enforce relief for the benefit of the corporation, it is not derivative and not a stockholders' suit." 13 W. Fletcher, Private Corporations § 5939 (perm. ed. 1970) (footnotes omitted).

[redacted] It is a general principle of corporate law that a minority stockholder who proceeds at his own expense in a derivative action resulting in a substantial benefit to the corporation is entitled to recover reasonable counsel fees from the corporation that has benefitted from his efforts. *See* 19 Am.Jur.2d Corporations § 588, at 111 (1965); 13 W. Fletcher, Private Corporations § 6045 (perm. ed. 1970); 10 C. Wright & A. Miller, Federal Practice and Procedure § 2675 (1973); Annot., Litigation Expense—Corporate Charge, 39 A.L.R.2d 580, 583 (1955); Annot., Litigation Expense—Corporation Liability, 152 A.L.R. 909, 914 (1914).

[redacted] The cases make it clear that "[t]he obligation to reimburse a shareholder who brings a successful derivative suit is an obligation of the corporation." Levine v. Bradlee, 378 F.2d 620, 622 (3d Cir. 1967). *See* Mills v. Electric Auto-Lite Co., 396 U.S. 375, 389–390, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) (assessing fees against corporation); Kahan v. Rosenstiel, 424 F.2d 161, 167 (3d Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970) ("In derivative suits . . . the corporation which benefits from the suit . . . is directed to pay [attorneys' fees]."); Denney v. Phillips & Buttorff Corp., 331 F.2d 249 (6th Cir.), cert. denied, 379 U.S. 831, 85 S.Ct. 61, 13 L.Ed.2d 39 (1964) (assessing fees against corporation). Counsel fees in such cases are not awarded individually against other stockholders who may have profited from the derivative litigation, but against the corporation. Speaking for the court in Jones v. Uris Sales Corp., 373 F.2d 644, 648 (2d Cir. 1967), Judge Friendly explained the rationale for this rule as follows:

> "[T]he reason for the award of such fees in a stockholder's derivative suit . . . [is] that the plaintiff's efforts have conferred on the corporation a benefit for which the corporation would otherwise have had to pay itself."

The present derivative actions were filed by minority stockholders of the Enquirer, not by minority stockholders of Scripps. There was no attorney-client relationship, derivatively or otherwise, between Scripps and the attorneys representing the four plaintiff minority shareholders.

Absent a finding that Scripps or the minority stockholders acted fraudulently or "in bad faith, vexatiously, wantonly, or for oppressive reasons," Hall v. Cole, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973), there is no legal basis for awarding any part of the attorneys' fees against the Scripps group or against the minority shareholders.[6] Under the

6. The only authority directly supporting an assessment against Scripps and the minority shareholders appears to be one law review article. Cole, Counsel Fees in Stockholders' Derivative and Class Actions—Hornstein Revisited, 6 U. Richmond L.Rev. 259, 279–81 (1972). Suffice it to say that we do not agree with the author's conclusions.

controlling law set forth above, the entire fee must be assessed against The Cincinnati Enquirer, Inc., the corporation whose stockholders initiated the derivative action.

■ The fact that the Scripps group and the minority stockholders profited from the sale of their stock at higher prices than those provided in the original contract is no basis for assessing against them any part of the attorneys' fees awarded to counsel who filed the derivative actions on behalf of the Enquirer. Incidental benefits to Scripps or minority stockholders, in the absence of an adjudication of fraud or misconduct on their part, does not justify a judgment against them for any part of the attorneys' fees. See Schleit v. British Overseas Airways Corp., 133 U.S.App.D.C. 273, 410 F.2d 261, 262 (1969); Preston v. United States, 284 F.2d 514, 515–516 (9th Cir. 1960); Jett v. Merchants and Planters Bank, 228 F.2d 156, 159 (4th Cir. 1955).

Accordingly, the judgment of the District Court filed October 10, 1973, is vacated insofar as it awards any part of the attorneys' fees therein adjudicated to be paid by any party other than The Cincinnati Enquirer, Inc.

It appears that, pursuant to an order of the District Court, $2.00 per share was withheld from the purchase price received by some of the minority shareholders who accepted the AFC tender offer. This fund was to be used for payment of plaintiffs' attorneys' fees. In view of the foregoing opinion, it is clear that the sums so withheld must be paid to the shareholders affected. To the extent, however, that AFC contributed its own money to this fund, it may, if it wishes, make this fund available for payment of the attorneys' fees assessed against the Enquirer, its wholly-owned subsidiary.

### 5) Scripps Cross-Claim

■ Scripps filed a cross-claim against the Enquirer on the basis of pendent jurisdiction, seeking to recover $291,-842.29 in attorneys' fees and other ex-

penses incurred by Scripps in the trial of these cases and $173,029.75 in attorneys' fees and other expenses incurred by Scripps in connection with the application for fees filed by plaintiffs' counsel. The District Court declined to accept pendent jurisdiction of this cross-claim. We hold that the District Court did not abuse its discretion in this respect.

### 6) Conclusion

The case is remanded to the District Court for further proceedings not inconsistent with this opinion, including modification of the judgment of October 10, 1973, so as to require payment by The Cincinnati Enquirer, Inc., of the fees allowed to the respective counsel, plus interest from October 10, 1973.

The costs of this appeal are taxed against The Cincinnati Enquirer, Inc.