Arthur Ray BOWLING, et al., Plaintiffs,

v.

PFIZER, INC., et al., Defendants.

No. C–1–91–256.

United States District Court,
S.D. Ohio,
Western Division.

March 1, 1996.

Marc David Mezibov, Sirkin, Pinales, Mezibov & Schwartz—1, Cincinnati, OH, for Adrienne Fedak, Ronald Dempster, Freda Dempster, Amicus Curiae Ministry of Health, Providence of Alberta, Canada, Ministry of Health Providence of Manitoba, Canada.

James Ralph Adams, Frost & Jacobs—1, Cincinnati, OH, for Pfizer Inc., Shiley Inc.

Larry M. Keller, Gary Green, Sidkoff, Pincus & Green P.C., Philadelphia, PA, Morton B. Wapner, Philadelphia, PA, for Putative Class in Pennsylvania.

Gates Thornton Richards, Gates T. Richards Company—1, Cincinnati, OH, John T. Johnson, Johnson & Dylewski P.C., Houston, TX, for Nellie Melling.

Elliot Polanieki, Cincinnati, OH, for Objectors Pennsylvania Class.

Thomas Collins Rink, Strauss & Troy—1, Cincinnati, OH, John Weld Peck, Peck, Shaffer & Williams—1, Cincinnati, OH, David B. Malone, Peck, Shaffer & Williams, Cincinnati, OH, for Robert L. Black, Jr.

Robert L. Black, Jr., Cincinnati, OH, Pro Se.

Brian Wolfman, Washington, DC, for amicus curiae Public Citizen.

Vance C. Simonds, Jr., Kasdan, Simonds, Peterson, McIntyre, Epstein & Martin, Irvine, CA, for amicus curiae Dutch Consumentenbond.

Thomas Collins Rink, Strauss & Troy—1, Cincinnati, OH, John Weld Peck, Peck, Shaffer & Williams—1, Cincinnati, OH, David B. Malone, Peck, Shaffer & Williams, Cincinnati, OH, for Peter J. Strauss.

Peter J. Strauss, Cincinnati, OH, Pro Se.

Stanley Morris Chesley, Waite, Schneider, Bayless & Chesley Co.—1, Cincinnati, OH, for Arthur Ray Bowling, Julie Whyle, Janet Boggess, Barbara Finley, Jeffrey Laton Taylor, Emma Carolyn Wright, Archie Calvert, James Pauley, Sonja Lee Bowling, Jeffrey James Whyle, Lawrence Boggess, Jackie Wright, Wanda Calvert.

Harry Bernard Plotnick, Cincinnati, OH, Bruce A. Finzen, Minneapolis, MN, for 183 Individuals, Listed at [38–1], who fall within the Definition of the Purported Class.

Elaine Pauley, On Behalf of Themselves and All Others.

Janet Gilligan Abaray, Sherrill Patricia Hondorf, Waite, Schneider, Bayless & Chesley Co.—1, Cincinnati, OH, Terrence Lee Goodman, Waite, Schneider, Bayless & Chesley Co.—1, Cincinnati, OH, Fay Elizabeth Stilz, Stanley Morris Chesley, Waite, Schneider, Bayless & Chesley—1, Cincinnati, OH, for Elaine Pauley.

## MEMORANDUM AND ORDER ON APPLICATIONS FOR ATTORNEYS' FEES AND EXPENSES

NANGLE, District Judge.

Individuals implanted with the Björk–Shiley convexo/concave heart valve brought this product liability action against the valve's manufacturer, Shiley, Inc., and its parent company, Pfizer, Inc., alleging that the valve has design and manufacture defects which

renders it hazardous to individuals in whom it has been implanted. On August 19, 1992, the Honorable S. Arthur Spiegel, Senior United States District Judge for the Southern District of Ohio, approved a settlement of the action on a worldwide class basis. Class and Special Counsel, as well as counsel for certain class members, are now before the Court seeking an award of attorneys' fees and expenses from the funds created by the settlement.

Pursuant to Orders entered August 3, 1995, and September 1, 1995, this case was transferred from the docket of Judge Spiegel to the docket of the undersigned,[1] for the purpose of determining the amount and source of attorneys' fees and expenses to be awarded in this case. The Order of September 1, 1995, also contained a number of findings with respect to the financial benefit of certain attorneys' activities. Specifically, Judge Spiegel concluded that Class Counsel, Stanley M Chesley, Esq., and Special Counsel, John T. Johnson, Esq., Brian Magaña, Esq., Louis Saul, Esq., Charles Wolfson, Esq., and James T. Capretz, Esq., had rendered valuable services to the plaintiff class and that their joint application should, therefore, be considered. Judge Spiegel also concluded that the applications of Brian Wolfman, Esq., on behalf of Public Citizen, Inc., and Thomas Herren, Esq., should be considered because they, too, had rendered valuable services to the plaintiff class. Judge Spiegel further concluded that the application of Sidkoff, Pincus & Green, P.C., and Wapner, Newman & Wigrizer, counsel for certain Pennsylvania class objectors, should be denied because their activities in this case had not conferred any financial benefit upon the Class. Finally, Judge Spiegel reserved for the undersigned the question of whether the activities of The Consumentenbond, and possibly others, benefited the plaintiff class.

Accordingly, a hearing was held in this district to consider the fee applications of those attorneys whose services had benefited the Class, as well as the applications of those for which a finding of benefit had been reserved for the undersigned. Upon order of the Court, all attorneys participating in the hearing prepared and submitted a comprehensive stipulation covering all issues relating to the fee applications before the Court. Additionally, the Court received evidence and heard argument at the hearing on the applications. Based upon the evidence and arguments presented at the hearing, as well as the parties' stipulations and other submissions, the Court issues the following Memorandum and Order.

## I. BACKGROUND

Between 1979 and 1986, Shiley, Inc., a wholly-owned subsidiary of Pfizer, Inc., manufactured a human-implant heart valve known as the Björk–Shiley convexo/concave heart valve ("c/c heart valve" or "valve"). Somewhere between 50,000 and 100,000 of the valves were implanted in patients worldwide. By 1992, approximately 450 of these valves had fractured resulting in approximately 300 deaths. The valves continue to fracture today and it is anticipated that they will continue to do so in the future.

As early as 1984, consumer groups such as the Washington, D.C.-based Public Citizen, Inc., claimed that the c/c heart valve posed a serious public health threat because it had design and manufacture defects which caused it to have an abnormally high risk of fracture. Defendants have steadfastly denied that the c/c heart valve is any more likely to fracture than any other valve available on the market at that time; however, when Public Citizen petitioned the Food and Drug Administration in 1990 to require defendants to notify implantees of the risks associated with the valves, defendants voluntarily agreed to undertake to find and notify implant patients and their physicians of the alleged risks posed by the valves.

The c/c heart valve has engendered a substantial amount of litigation. Individuals implanted with valves that have fractured, as well as individuals with properly functioning valves, have brought suit against defendants in jurisdictions across the United States. In every suit involving a valve that had actually

1. Sitting in the Southern District of Ohio by designation and appointment of the Honorable William H. Rehnquist, Chief Justice of the United States Supreme Court.

fractured, defendants were able to settle the case with a confidential agreement. In cases where there had been no fracture, however, defendants were able to get at least 27 courts to dismiss the suits on the ground that there is no right of recovery for emotional distress arising from a valve implantee's fear that a properly functioning valve might fracture in the future.

Although defendants had generally been successful at settling all fracture cases and getting non-fracture cases dismissed, the litigation and attendant poor publicity was nevertheless taking its toll. Defendants were having to devote substantial resources to defending the nation-wide litigation, and a California court denied their motion for summary judgment in a case where a plaintiff had a properly functioning c/c heart valve. Furthermore, criticism of the valve and of the defendants in newspaper articles, television programs and even congressional hearings began to mount. *See Bowling v. Pfizer, Inc.,* 143 F.R.D. 141, 147–48 (S.D.Ohio 1992). Thus, as Judge Spiegel observed in his Order finding the proposed settlement to be fair, defendants had ample reason to settle all claims involving their c/c heart valves. *Id.*

## II. *PROCEDURAL HISTORY*

All of the named plaintiffs in this action had properly functioning c/c heart valves when their complaint was filed on April 19, 1991. The causes of action asserted in their complaint included negligence, strict liability, negligent misrepresentation, fraudulent misrepresentation, intentional infliction of emotional distress and negligent infliction of emotional distress; and the relief sought included compensatory damages, medical monitoring and punitive damages. The complaint also proposed a class action under Rule 23 of the Federal Rules of Civil Procedure.

In response to these allegations, defendants filed a motion to dismiss for lack of jurisdiction and a motion for summary judgment contending, among other things, that there was no right of recovery for the emotional distress arising from plaintiffs' fear that their properly working heart valves might fracture in the future. Defendants also filed a motion requesting that their mo-

tions to dismiss and for summary judgment be heard with plaintiffs' request for class certification.

Before the Court ruled on defendants' motions, however, Class Counsel and counsel for defendants informed the Court that the parties had initiated settlement negotiations. The Court subsequently denied defendants' request for a consolidated hearing on their motions and class certification and, at a November 19, 1991, status conference, the parties indicated to the Court that they were in the final stages of negotiating a settlement that would apply to all individuals implanted with the c/c heart valve. Approximately two months later, the parties informed the Court that they had agreed upon a proposed settlement. The Court thereafter granted the parties' Joint Motion for Conditional Class Certification for Settlement Purposes (Doc. 43) and set a fairness hearing to consider the proposed settlement for June, 1992.

Numerous objections to the proposed settlement were filed, most asserting that the settlement did not provide sufficient benefits to class members. At the fairness hearing to consider the proposed settlement, held June 5, 8 and 9, 1992, and July, 22, 1992, the Court likewise expressed several concerns about the benefits available to class members under the settlement. In response, Class Counsel, with assistance from a number of attorneys representing objecting class members, including John Johnson, Brian Magaña, Lewis Saul, Charles Wolfson, James Capretz and Brian Wolfman, negotiated a number of substantive improvements to the settlement.

Thus, by the time the final, enhanced version of the proposed settlement was submitted to the Court, there were essentially only two objecting factions remaining. One was comprised of two Pennsylvania law firms, Sidkoff, Pincus & Green, P.C., and Wapner, Newman & Associates ("Pennsylvania attorneys"). The Pennsylvania attorneys represented certain members of the proposed class who were representative plaintiffs in a putative class action in the Court of Common Pleas, Philadelphia County, Pennsylvania. The second objector was Public Citizen. Although its attorney, Brian Wolfman, had participated in the negotiations leading to the

enhancements to the settlement, Public Citizen was nevertheless unsatisfied with the finished product and lodged a number of objections. The Court, after considering each of the objections in a lengthy and detailed Order entered August 19, 1992, concluded that the settlement, when viewed "holistically", is fair, adequate and reasonable. *Bowling*, 143 F.R.D. at 170. The Court was particularly swayed by the fact that, while the settlement offered class members a host of benefits, the only right relinquished by participating class members is the right to pursue the speculative claim of emotional distress arising out of the fear that a properly functioning heart valve may fracture in the future. Accordingly, the Court entered judgment on September 10, 1992, certifying the settlement class, approving the proposed settlement and retaining jurisdiction to determine attorneys' fees and expenses and to take any action required for the implementation of the settlement (Doc. 255).

As previously noted, Class Counsel was assisted by several of the objecting attorneys during the rounds of negotiations that took place after the settlement had been initially submitted to the Court. At some point during or after these negotiations, Class Counsel determined that the Class would benefit from the specialized knowledge that many of the objecting attorneys possessed. Accordingly, Class Counsel moved the Court for the appointment of James T. Capretz, John T. Johnson, Brian R. Magaña, Lewis J. Saul and Charles M. Wolfson as Special Counsel to assist him in the effectuation of the proposed settlement. By Order entered September 14, 1995, the Court appointed each as Special Counsel to Class Counsel.[2]

## III. *THE SETTLEMENT*

The settlement applies to all living persons currently implanted with c/c heart valves (approximately 50,000 people) and their current spouses, except those who file valid and timely requests for exclusion. The settlement has three primary components: The Patient Benefit Fund, The Medical and Psychological Consultation Fund and The Fracture Compensation Mechanism.

### A. *The Patient Benefit Fund*

The Patient Benefit Fund is a guaranteed fund of $37.5 million, which may increase to as much as $75 million, that is to be used to fund research and development and valve replacement surgery ("explanation") for qualifying class members. The settlement requires defendants to deposit $12.5 million following "Final Approval of the Settlement",[3] and then $6.25 million annually starting on the second anniversary of the Final Approval of the Settlement. Once the defendants have contributed $37.5 million to the Fund, they are entitled to go before the Court and argue that further research would be fruitless and that they should not, therefore, be required to make further contributions to the Fund. If they are unsuccessful in their argument, then they are required to continue the annual contribution of $6.25 million until they have deposited a total of $75 million.

In order to administer the benefits available under the Patient Benefit Fund, the

---

**2.** The Court's Order provides:

Upon motion of Class Counsel, it is hereby ORDERED that the following individuals are hereby appointed to act as Special Counsel to Class Counsel to assist Class Counsel in the effectuation of the proposed settlement:

James T. Capretz, Irvine California (assistance to Class Counsel in the implementation of the plan with particular emphasis in the area of valve replacement guidelines and protocols);

John T. Johnson, Houston, Texas (concentration in the area of identification of high risk of strut fracture of C/C valves of class members based upon a review of Shiley's manufacturing process records);

Brian R. Magaña, Los Angeles, California, (concentration in the area of foreign claimants);

Lewis J. Saul, Bethesda, Maryland (concentration in the area of foreign claimants);

Charles M. Wolfson, Sydney, Australia (concentration in the area of foreign claimants).

Order Appointing Special Counsel, C–1–91–256 (September 14, 1992) (doc. 257).

**3.** "Final Approval of the Settlement" is defined as "when the Order and Final Judgment approving this Agreement and Settlement has been entered, all appeals have been exhausted, and no further appeal may be taken." Supplemented Agreement of Compromise and Settlement, at 6, ¶ 3.10.

settlement creates a seven-member Supervisory Panel to manage the research and to determine whether a class member qualifies for a particular benefit. The Panel is to be comprised of six experts and one layman and all of the fees and expenses of the Panel are to be paid from this Fund. Supplemented Agreement of Compromise and Settlement, at 13–14. The specific benefits available under the Fund are:

**Research and Development.** The fund will pay for research and development of diagnostic techniques to identify implantees who have a significant risk of valve fracture, and research to reduce and properly characterize the risks associated with valve replacement surgery. Supplemented Agreement of Compromise and Settlement, at 8.

**Payment of Expenses Associated With Explant Surgery.** Payment of the usual and customary expenses for valve replacement surgery that are not covered by a third-party payor (i.e. insurance company, government, etc.), where surgery is necessitated by risk of valve fracture. *Id.* at 11.

**$38,000.00 for Miscellaneous Expenses.** Payment of $38,000.00 to each member who undergoes an explant surgery approved by the Panel and who does not suffer death or permanent bodily injury. This payment is to cover miscellaneous costs of post-hospitalization care, meals, travel, etc. *Id.* at 19.

**Temporary Loss of Income.** Member's actual lost income, up to $1,500.00 per week for a maximum of 16 total weeks, resulting from a member's inability to work because of hospitalization and recuperation from a qualifying valve replacement surgery. The amount payable is reduced by any payments available from a third-party payor, such as worker's compensation, sick pay, disability insurance, etc. *Id.* The lost income is only payable from the sixteenth through fifty-second week after surgery. *Id.*

**Permanent Loss of Income.** If, after one year, a member is partially disabled from explant surgery and, as a result, suffers a diminished earning capacity and/or ex-

traordinary medical expenses, then he will receive compensation for future income loss that is not covered by workmen's compensation, a disability policy or other third-party source. *Id.*

**Alternative Payment for Death or Permanent Total Disability.** If valve replacement surgery results in death or permanent total disability, then a member is entitled to:

> (1) The same payment available to a member whose valve actually fractures under the Valve Compensation Mechanism; or

> (2) Compensation as set by an arbitration procedure. *Id.* at 21.

**Payment for FDA Approved Diagnostic Procedure.** If the Food and Drug Administration approves a technique for diagnosing valves with a high risk of fracture, then the Supervisory Panel may use the money from the Fund to pay for the use of the technique on class members where it is reasonably medically necessary. *Id.* at 8, 16–17.

Additionally, this portion of the settlement permits a class member, who qualifies for valve replacement surgery but chooses not to undergo surgery, to bring an action for damages for alleged emotional distress from fear of fracture of a working valve if the class member has not received any fracture compensation under the settlement.[4] *Id.* at 10. Finally, in the event that class members continue to qualify for explant surgery after the Fund is fully expanded to $75 million, the settlement obligates defendants to continue to pay all of the members' qualifying expenses and benefits listed above even though defendants' total contribution to the Fund would exceed $75 million. *Id.* at 12–13, & 23.

### B. *The Medical and Psychological Consultation Fund*

The Medical and Psychological Consultation Fund ("Consultation Fund") is a fund of at least $80 million, which could increase to as much as $130 million, that is intended to provide class members with funds to obtain

---

4.    Bringing such an action waives all of the     member's future rights under the settlement.

medical and psychological consultation.[5] The fund will provide an equal cash payment of between $2,500.00 and $4,000.00 to each member, depending upon how many class members make a claim. Defendants are also required, under this part of the settlement, to pay an additional $10 million into the Fund, which is to be paid to spouses of valve implantees ("Spousal Compensation Fund").

The settlement requires defendants to deposit $80 million as soon as practicable after the settlement is signed. *Id.* at 23.[6] After payment of fees and expenses, the total amount of the Consultation Fund will be equally divided and distributed to all "Claimants".[7] If the total number of members participating in this Fund exceeds 20,000, however, then defendants shall make additional payments into the Fund in accordance with the following schedule:

For each Claimant over 20,000 up to 30,000, $2,500.00 per additional Claimant;

For each Claimant over 30,000 up to 35,000, $1,500.00 per additional Claimant;

For each Claimant over 35,000 up to 40,000, $1,200.00 per additional Claimant; and

For each additional Claimant over 40,000, $750.00 per Claimant. *Id.* at 24.

In similar fashion, the $10 million Spousal Compensation Fund will, after payment of any expenses and fees, be divided equally among all claimants who are spouses of class members that have been implanted with c/c valves. *Id.* at 25. Defendants are not, however, required to pay into this Fund until "Final Approval of the Settlement." *Id.* at 24.

### C. *The Valve Fracture Mechanism*

The third component of the settlement, the Valve Fracture Mechanism, provides an implantee whose valve has fractured with one of three options for seeking compensation. The first option is a sort of insurance program whereby compensation is determined by a set of formulas that take into account a claimant's family status, age, income and country of residence. The compensation available to a United States resident, for example, ranges from a minimum of $500,000.00 to a maximum of $2,000,000.00, while the payment to members from other countries may be something less but is in no event less than $50,000.00. *Id.* at 25, App. C; First Report of the Special Masters/Trustees, App. 1 (Court's Exh. 11). The settlement creates a Foreign Fracture Panel, which will determine fair compensation for fracture claimants who are residents of countries other than the United States. *Id.* at 25–26.

The second alternative available to a fracture claimant under the mechanism is binding arbitration. The claimant can bring his or her claim before a three-member panel, whose decision is final and binding. *Id.* at 27. The third option is to bring suit against defendants in an appropriate forum, with all claims and defenses preserved. *Id.* at 28.

### IV. *IMPLEMENTATION OF THE SETTLEMENT*

A number of appeals were taken from the Court's judgment of September 10, 1992, approving the settlement. As a result, this Court was without jurisdiction over this case until the Sixth Circuit Court of Appeals dismissed the final appeal on March 15, 1994. The United States Supreme Court subsequently denied a petition for writ of certiorari on October 3, 1994,[8] and "Final Approval of the Settlement", as that term is defined in the settlement, occurred at that time. Accordingly, the defendants thereafter made the required initial payment of $12.5 million

---

5. There is, however, no restriction upon a class member's use of the funds.

6. On January 28, 1992, the Court entered an order appointing the Honorable Robert L. Black, Jr., as Trustee to receive, hold and invest the immediate payment by defendants of the $80,000,000.00 for the Medical and Psychological Consultation Fund.

7. The settlement defines "Claimants" as "all Settlement Class Members who timely participate in the Medical and Psychological Consultation Fund Claims process." (*Id.* at 5, ¶ 3.6)

8. *See Ridgeway v. Pfizer, Inc.,* —— U.S. ——, 115 S.Ct. 294, 130 L.Ed.2d 208 (1994).

into the Patient Benefit Fund.[9] Thus, defendants' contributions to the Patient Benefit Fund should be as follows:

| Year | Amount of Pmt. | Running Total |
| --- | --- | --- |
| 1994 | $12.50 million | $12.5 million |
| 1996 [10] | $ 6.25 million | $18.75 million |
| 1997 | $ 6.25 million | $25.00 million |
| 1998 | $ 6.25 million | $31.25 million |
| 1999 | $ 6.25 million | $37.50 million [11] |
| 2000 | $ 6.25 million | $43.75 million |
| 2001 | $ 6.25 million | $50.00 million |
| 2002 | $ 6.25 million | $56.25 million |
| 2003 | $ 6.25 million | $62.50 million |
| 2004 | $ 6.25 million | $68.75 million |
| 2005 | $ 6.25 million | $75.00 million |

On April 13, 1994, the Court appointed the Honorable Robert L. Black, Jr., and Peter J. Strauss, Esq., as Special Masters/Trustees to implement the settlement. The Trustees have since hired a Claims Administrator and set up and staffed an office in Cincinnati, Ohio.

On May 13, 1994, the Court appointed the two expert panels provided for in the settlement: the Supervisory Panel and Foreign Fracture Panel. On January 4, 1995, the Foreign Fracture Panel issued its final report establishing compensation schedules for foreign valve implantees who suffer a fracture. *See* First Report of the Special Masters/Trustees, App. 1 (Court's Exh. 11).

The Supervisory Panel, with the approval of the Court, selected a Guidelines Committee to consider and recommend new guidelines for determining whether a class member qualifies for the diagnostic procedures and/or explant surgery available under the Patient Benefit Fund. Although the Committee held its first meeting in July of 1995, it has yet to propose any guidelines. Thus, class members are currently required to qualify under the guidelines established by the defendants, which are considered by most to be far too restrictive. The Supervisory Panel has also approved a number of research projects, many of which were already being carried out under the direction and funding of the defendants prior to the settlement.

An important issue of settlement interpretation that has arisen is whether a class member implanted with a valve that suffers a so-called "single-leg fracture" or "single-strut separation" qualifies for explanation benefits and/or compensation under the Fracture Mechanism. Class and Special Counsel took the position that a member suffering a single-leg separation should receive the same treatment under the settlement that a member suffering a full, dual-leg fracture receives.[12] Defendants disagreed, taking the position that a single-leg separation is qualitatively different from a full, dual-leg fracture and, as a result, a class member suffering such a separation should not be entitled to the same benefits as a member suffering a complete fracture. The parties resolved the issue through an agreement that Class Counsel would negotiate with the defendants each single-leg fracture case on an individual basis. As of October 20, 1995, the Claims Administrator had referred 16 single-leg fracture claims to Class Counsel. Third Report of the Special Masters/Trustees, at 10 (Court's Exh. 13).

Participation in the Consultation Fund has been substantially lower than the 20,000 to 40,000 claims that the parties had anticipated. As of the date of the Trustees' most recent report, October 26, 1995, the Claims Administrator had received 12,002 claims and had determined that 1,680 of these claims were non-qualifying. *Id.* at 2–3. The lower than expected participation in the Fund does

9. Defendants also paid in the $10 million for the Spousal Compensation Fund.

10. As previously noted, the settlement requires defendants to make an initial payment of $12.5 million upon Final Approval of the Settlement, and then annual payments, to be begin on the *second* anniversary of the Final Approval of the Settlement, of $6.25 million. Thus, defendants made no payment into this Fund in 1995.

11. As previously set forth, defendants can, after contributing $37.5 million to the Fund, go before the Court and argue that no further contributions to the Fund are warranted.

12. It is the Court's understanding that, when only one of the two legs on the c/c valve fractures, the valve continues to function; whereas, when both legs fracture, the valve stops functioning.

not affect the minimum size of the Fund;[13] defendants paid in the required $80 million at the inception of the settlement and it has since earned approximately $7.5 million in interest. Thus, class members participating in the Fund are expected to receive a substantially larger individual payment than had originally been estimated by the parties.

In order to obtain maximum participation in this Fund, the Trustees extended the deadline for filing claims to December 31, 1995. In the meantime, the Trustees made a partial distribution from the Consultation Fund to qualified claimants of $3,000.00, as well as a partial payment of $500.00 to qualified spousal claimants from the $10 million Spousal Compensation Fund. The Trustees will distribute the remainder of the Fund, less any attorneys' fees awarded from the Fund, upon a final determination of the number of qualified claimants.

## V. *PETITIONS FOR ATTORNEYS' FEES AND OBJECTIONS THERETO*

On September 11, 1995, Class Counsel, Special Counsel and Counsel for Public Citizen filed, in accordance with this Court's Order of September 5, 1995, their stipulations of fact relevant to the issues raised by the fee applications before the Court.[14] The facts to which they stipulated to include the following:

1. Under the terms of the settlement, Class Counsel is required to provide services to the Class throughout the entire life of the settlement.

2. Special Counsel have agreed to provide the following future services to the Class in order to assist in the implementation of the settlement:

(a) John Johnson's work will focus on identification of class members who are carrying valves that have a high risk of fracture;

(b) James Capretz's work will focus on adoption of valve replacement guidelines and protocols.

3. The separate time and expense records submitted by Class Counsel and Special Counsel fairly and accurately represent the services performed and the quantity of time expended in rendering those services and expenses incurred.

4. The time and expense records submitted by *Amicus* Public Citizen and its counsel, Brian Wolfman, fairly and accurately represent the services performed and the quantity of time expended in rendering those services and expenses incurred.

5. Interest that accumulates on the monies awarded by the Court as compensation for services rendered or expenses incurred by the attorneys in this action subsequent to the date of the order awarding such fees and expenses, through date of distribution, shall also be awarded and distributed.

6. Any attorneys' fees and costs awarded in this case shall be drawn pro rata from the Consultation Fund (including the Spousal Compensation portion thereof) and the Patient Benefit Fund.

### A. *Joint Application of Class and Special Counsel*

Class and Special Counsel have made joint application to the Court seeking a single, lump-sum award for their past and future attorneys' fees and expenses incurred in this case. Class Counsel has reached an agreement with each of the Special Counsel as to how the award will be divided.[15]

---

13. The relatively low participation in the Fund does, however, mean that the defendants will not have to make any further payments into the Fund in accordance with the schedule set forth *supra*, Part III.

14. Although Public Citizen has a relatively modest application for an award of fees and expenses before the Court, its primary role in this portion of the case has been that of objector to Class and Special Counsel's joint application for fees and expenses. Thus, the stipu-

lations submitted to the Court were the result of agreement by parties in an adversarial posture.

15. As of the September 14, 1995, hearing, Class Counsel had entered into fee sharing arrangements with Special Counsel Johnson, Saul, Magaña and Wolfson, but those agreements have not been made available to Public Citizen or to the class members. They have, however, been submitted to the Court *in camera*. Mr. Capretz, on the other hand, had not

In support of their application, Class and Special Counsel contend that the settlement has created a fund with a total fixed, predetermined cash value of $165 million, broken down as $75 million for the Patient Benefit Fund, $80 million for the Consultation Fund and $10 million for the Spousal Compensation Fund. Counsel further assert that the unfixed monetary value of benefits available to class members (via the Fracture Compensation Mechanism and other benefits) may exceed $335 million and, therefore, that the total value of the settlement, without taking account of any present value considerations, may exceed $500 million.

Although Counsel value the settlement at over $500 million, they seek payment of their fees and expenses from only the $165 million common fund which they claim is created by the Patient Benefit, Consultation and Spousal Funds. Thus, in their initial application, filed October 9, 1992, Counsel sought an award of 13% of the $165 million common fund, or $20 million, as compensation for their past work in negotiating and winning approval of the settlement and for their current and future work in implementing and administering the open-ended provisions of the settlement. However, in their first supplement to the application, filed May 19, 1995, Counsel increased their fee request to 20% of the $165 million fund, or $33 million. Counsel's justification for the increased request is that their initial estimate of the time and labor required to implement and administer the settlement was far too conservative based upon the work that they had already done under the settlement. Thus, according to Counsel, the 7% increase in their request is required to adequately compensate them for the future work to which they have committed under the settlement.

On August 29, 1995, Counsel filed a second supplement to their application in which they provide a final update of the services performed and hours worked by Class Counsel, as well as Special Counsel Johnson and Saul. Thus, the application, as supplemented through August 29, 1995, details the services

rendered and hours expended by each attorney. Following is a summary of the individual contributions and activities of Counsel in this case as set forth in the application.

### 1. *Class Counsel Stanley M. Chesley*

Class Counsel and his firm, Waite, Schneider, Bayless & Chesley Co., LPA, have expended a total of 16,364.25 hours on this case through August 15, 1995, broken down as follows:

| | | |
|---|---|---|
| Attorneys' Time | — | 6,739.00 hours |
| Paralegals' Time | — | 613.00 hours |
| Law Clerks' Time | — | 602.00 hours |
| Staff Time | — | 8,410.25 hours |

The hourly rates for attorney's in Counsel's firm range from $140.00 for associates to Mr. Chesley's current rate of $300 per hour. Paralegal and law clerk time is generally valued at $60.00 per hour, while staff time is valued at $25 per hour. Additionally, Class Counsel has incurred expenses totaling $349,551.30.

As Class Counsel, Mr. Chesley initiated this action, negotiated the initial settlement agreement and was the lead negotiator in the subsequent rounds of negotiations that led to the enhancements to the settlement. More specifically, he provided services in the following areas during the period leading up to the Court's approval of the settlement:

1) Investigation Prior to Filing the Complaint;
2) Filing of Pleadings and Motions;
3) Settlement Negotiations;
4) Discovery;
5) Class Notification Program;
6) Preparation For and Participation in the Fairness Hearings;
7) Initial Activities in the Effectuation of the Terms and Provisions of the Settlement.

Following approval of the settlement, Class Counsel's efforts have been focused in the following areas:

1) Establishment of the Foreign Fracture Panel and the Supervisory Panel;

joined in the joint fee application as of the September 14 hearing. However, by letter dated October 11, 1995, Class Counsel informed the Court that Mr. Capretz had joined

in the joint fee application. Accordingly, the Court will treat Capretz's separate fee application as part of Counsel's joint application.

2) Development of the "Foreign Fracture Formulae";

3) Assistance to the Supervisory Panel;

4) Assistance to the Special Masters/Co–Trustees;

5) Establishment of preliminary protocols and claims procedures for use by the Claims Administrator;

6) Design of the second "class notice," as well as the claim form for the Consultation Fund;

7) Provision of various services to class members;

8) Assistance in resolving fracture and explantation claims when contacted by individual class members or their attorneys;

9) Continued negotiations with defendants over the "single leg fracture" issue;

10) Opposition to the appeals of the Court's approval of the settlement.

### 2. *Special Counsel John Johnson*

Mr. Johnson, his former and current law firms, and his English co-counsel, Alexander Harris & Co., have spent a total of 9,706.14 [16] hours on this case at hourly rates ranging from $70.00 to $205.00 for attorneys,[17] and $50.00 to $60.00 for law clerks and paralegals. Mr. Johnson's hours break down as follows:

| Attorneys' Time | — | 8,299.99 hours |
|---|---|---|
| Paralegals' Time | — | 1,349.95 hours |
| Law Clerks | — | 56.20 hours |

Mr. Johnson's expenses total $273,799.95.[18]

Prior to the filing of this action, Mr. Johnson did what is generally regarded as some of the most valuable discovery work done in the c/c heart valve litigation. Through his extensive review of Shiley's manufacturing records, Mr. Johnson uncovered Shiley's allegedly shoddy manufacturing practices, which included the polishing, rewelding and reconditioning of cracked and otherwise defective valves and the falsification of manufacturing records. Mr. Johnson is now capable of reading and interpreting Shiley's voluminous and complex records and claims that he can predict fracture rates based upon the records associated with a particular valve. Accordingly, much of Mr. Johnson's future work as Special Counsel will be devoted to researching Shiley's records.

As an objector to the settlement, Johnson demanded and helped negotiate the following enhancements to the settlement:

1) The defendants' unconditional agreement to assist and pay for the identification of those implantees with "reconditioned" valves;

2) Compensation for members who undergo explantation of all related medical bills, travel expenses and pain and suffering; and

3) Compensation for the mental anguish of those members who should undergo explantation but who, for reasons of health, age, etc., decide not to undergo the procedure, as well as an unconditional agreement that defendants will pay for the explantation of these members if the procedure is required on an emergency basis in the future.

In addition to his work in reviewing hundreds of thousands of pages of Shiley manufacturing records in order to identify members that were implanted with valves having the highest risk of fracture, Johnson's work as Special Counsel has included preparing and making an extensive presentation to the Supervisory Panel to assist it in the establishment of guidelines for explantation, working with the Foreign Fracture Panel, updating foreign counsel on the status of the settlement, assisting Class Counsel in opposing appeals to the Sixth Circuit and assisting Class Counsel in his efforts to have the settlement interpreted as entitling class members with valves that have a single-leg fracture to full fracture benefits. Johnson expects that his work in this case will continue to consume at least 50% or more of his

---

16. This figure includes 748.89 hours billed by Alexander Harris & Co.

17. The hourly rate for Alexander Harris & Co. ranges from 100 Pounds in 1990 and 1991 to 120 Pounds in 1992.

18. This expense figure includes $36,045.32 in expenses incurred by Alexander Harris & Co.

time for another five to ten years if implementation of the settlement continues as it has.

### 3. *Special Counsel Lewis J. Saul*

Mr. Saul, and his New Zealand co-counsel, Michael Okkerse, have expended a total of 1,448.15 hours on this case and have incurred expenses totaling $13,773.17. All of these hours were billed either by Mr. Saul at an hourly rate of $250.00[19] or by Mr. Okkerse at an hourly rate of $225.00

Mr. Saul represented a number of New Zealand plaintiffs who initially objected to the settlement and was one of the moving forces behind the following improvements to the settlement:

1) The initial settlement proposal assigned New Zealand a Class III classification under the Fracture Compensation Mechanism on the mistaken belief that New Zealand did not have a common law tort system. Based upon the expertise of Saul and others, New Zealand was reclassified to the much more favorable Class I category;

2) Obtained a substantial increase in the minimum compensation for fracture victims of all foreign countries; and

3) Helped obtain the $10 million spousal compensation fund.

In addition, he and Mr. Okkerse performed painstaking research and investigation concerning the distribution of the valves to New Zealanders and undertook to provide notification of the settlement to many New Zealand health organizations that had not received the original notice of the settlement.

As Special Counsel, Mr. Saul's work has focused on identifying qualified and willing candidates for inclusion on the Supervisory Panel, as well as the Foreign Fracture Panel. He will also provide ongoing service to the Panels and will monitor and represent the interests of foreign class members to assure that they are adequately compensated and treated equitably under the settlement.

### 4. *Special Counsel Charles Wolfson*

Mr. Wolfson has expended 286.6 hours on this case and has incurred estimated expenses of $10,350.00.[20] The application does not indicate an hourly rate for Mr. Wolfson.

Mr. Wolfson acted for Australia in much the same way that Mr. Saul acted for New Zealand. He argued along with Mr. Saul for the inclusion of the Spousal Compensation Fund and took the lead in developing and securing the concept of guaranteed minimum compensation for foreign class members in cases of valve fractures and unsuccessful explantations. As Special Counsel, Mr. Wolfson's work will focus on assuring that Australian class members are treated equitably under the settlement.

### 5. *Special Counsel Brian Magaña*

Counsel's application does not indicate the number of hours that Mr. Magaña and his Dutch co-counsel, Jan Beer, have expended on this case. Mr. Magaña became involved in this case in 1992 representing the interests of Dutch and other foreign members. As part of his representation of a Dutch consumers' organization known as The Consumentenbond, Mr. Magaña helped negotiate the following improvements to the settlement:

1) The $38,000.00 expense reimbursement provision for explant patients;

2) A $200,000.00 minimum payment for persons from "Group II Countries" (including Holland); and

3) Changes in the way Foreign Fracture Panel operates and clarification of the scope of the Panel's powers.

As Special Counsel, Mr. Magaña will continue to address the particular interests of foreign class members.

### 6. *Special Counsel James T. Capretz*

Mr. Capretz and his current and former law firms have spent a total of 2,179.90 hours on this case through July 27, 1995, at hourly rates ranging from $70.00 to $225.00. His

**19.** Mr. Saul claims an hourly rate of $300.00 for 2.25 of his hours.

**20.** Mr. Wolfson resides and practices in Australia; thus, he was required to estimate his expenses in United States dollars. Class Counsel subsequently submitted ledger indicating that Mr. Wolfson had incurred $26,265.00 in expenses, but he does not indicate whether this figure is in United States or Australian dollars.

expenses total $63,005.06. Mr. Capretz's application does not break down his claimed hours into attorney and non-attorney time.[21]

Mr. Capretz and his former and current law firms have been at the forefront of the Shiley heart-valve litigation, representing plaintiffs in a number of suits filed in California. As an objector to the settlement, Mr. Capretz helped bring about a number of improvements to the settlement, including:

1) Limiting members' release of claims to that of emotional distress for fear of fracture;

2) Providing benefits beyond direct medical expenses for explantation;

3) Requiring defendants to accelerate annual payments into the funds if needed by class members;

4) Obtaining from defendants the understanding that compensation for explants will not reduce the research budget;

5) Class members' right to appeal if explant surgery is denied;

6) The right of members with a high risk of fracture but the inability to undergo surgery to sue for emotional distress;

7) Re-evaluation of members denied explantation if the guidelines are subsequently modified;

8) Guaranteed payment of medical expenses in advance if required to obtain explant surgery;

9) The appointment of a layman, rather than a scientist, as the seventh member of the Supervisory Panel;

10) The addition of several provisions in the settlement to ensure that no profit inures to defendants out of settlement activities;

11) Creation of a public information repository;

12) Requirement that explant surgery guidelines be predicated only upon "ob-

jective" matters, such as valve characteristics; and

13) Creation of the Spousal Compensation Fund.

As Special Counsel, Mr. Capretz has appeared at Supervisory Panel meetings, has assisted in a program to provide class members with access to their valves' manufacturing records and has generally worked with the Court, the Trustees and the Claims Administrator in implementing the settlement.

## B. *The Objection of Public Citizen, Gary Crane and Other Class Members to Counsel's Joint Application*

Public Citizen, Gary Crane and certain other class members (hereinafter "Public Citizen") together filed an extensive objection to Class and Special Counsel's joint fee application.[22] First, and perhaps foremost, Public Citizen does not agree with Class and Special Counsel's valuation of the settlement. Public Citizen contends that, when present value and contingency considerations are taken into account, the total value of the settlement is somewhere between $125 and $190 million.[23]

Public Citizen also depicts the settlement as a "mixed bag", characterizing the fracture compensation provisions of the settlement as very beneficial, the research to be funded under the plan as thus far only moderately beneficial, and the provisions for explantation minimally beneficial because the Supervisory Panel has yet to issue new guidelines for determining who qualifies for such a procedure. In addition, Public Citizen asserts that three United States law firms representing a substantial number of implantees with properly functioning valves opted their clients out of the settlement *en masse*, and that these individuals are now settling their emotional distress claims for far more than what a class member participating in the Consultation Fund is scheduled to receive under the set-

---

**21.** Actually, Mr. Capretz's application breaks down his total claimed hours by individuals but does not indicate which individuals are attorneys and which are not.

**22.** The Pennsylvania attorneys also filed an objection to Counsel's joint application on August 30, 1995 (Doc. 641). Because their objection is largely subsumed by Public Citizen's

objection, the Court will not separately consider it.

**23.** Public Citizen stipulated, however, to $165 million as the value of the common fund for the purpose of making an award to Class and Special Counsel. As set forth *infra*, Part IV, the Court rejects this figure as the true value of the common fund in this case.

tlement.[24] Thus, according to Public Citizen, there were two basic reactions to the settlement: (1) those with representation opted out, and (2) those without representation acquiesced to the settlement. Public Citizen thus concludes that the Class' working-valve claims were worth well in excess of the $80 million paid into the Consultation Fund, as it and other parties had always maintained.

As to Class and Special Counsel's fee request, Public Citizen contends that Counsel's application must be evaluated under the lodestar method for two reasons. This first is that the size of the fund is relatively large, and making an award on a percentage basis without cross-checking it with a lodestar analysis will result in a windfall to Counsel. Second, because Special Counsel started out as objectors to the settlement, failure to make their awards on a lodestar basis creates the appearance that Class Counsel was able to "buy off" their objections by agreeing to appoint them as Special Counsel and pay them a fee that does not bear a relationship to their work or contribution to the settlement.

Based upon its lodestar analysis, Public Citizen asserts that Counsel's fee request of $33 million is dramatically out of line with the value of their services on an hourly basis. Following is a summary of Public Citizen's analysis of each attorney's lodestar.

### 1. *Class Counsel*

Public Citizen assumes that the current hourly rates of all attorneys, law clerks and paralegals in Class Counsel's firm are reasonable, particularly in view of the delay in payment. It argues, however, that the following reductions in Counsel's claimed hours are required: (1) all 8,410.25 hours for "staff" work because this time is part of the overhead included in the attorneys' billing rates and therefore is not compensable; (2) an across-the-board reduction of 20% in attorney hours because of duplication of effort, overstaffing, inadequate descriptions of tasks performed and attorney time expended on

work not requiring an attorney; and (3) a 50% reduction in law clerk/paralegal time because that percentage of their time was devoted to clerical duties such as copying and filing, which are not properly compensable.

Based upon these reductions, Public Citizen calculates a basic lodestar for Class Counsel and his firm of $1,234,547.00. Public Citizen then applies a multiplier of 2.0 for fees incurred before approval of the settlement, which it believes sufficiently reflects the fact that there was some risk of non-recovery, but not a great amount of risk because the case was brought for the purpose of settlement. For all of Counsel's fees incurred after the Court's approval of the settlement, Public Citizen argues that a reduced multiplier of 1.05 is appropriate because there was very little risk of non-recovery. Applying these multipliers, Public Citizen calculates an enhanced fee of $1,936,497.90 plus all of claimed expenses of $349,551.30, thus yielding a total award for Class Counsel of $2,286,049.20.

Based upon this lodestar analysis and the relatively large size of the common fund, Public Citizen asserts that an award based upon a percentage of the fund should be, at most, 5% of the $165 million fund, which yields a fee of $8.25 million. This figure is four times Class Counsel's enhanced lodestar, as calculated by Public Citizen, but it would not, according to Public Citizen, be unreasonable in light of the results achieved and the future work facing Class Counsel under the settlement.

### 2. *Special Counsel John Johnson*

Public Citizen agrees that Mr. Johnson has done extremely important work in his litigation against defendants because he has learned to read Shiley's voluminous and complex manufacturing records, which are allegedly critical to identifying valves with a high risk of fracture. However, Public Citizen rejects this as a basis for the recovery of his hours in 1987, 1988, 1989, 1990 and 1991 hours, which he expended in a Texas case

---

24. The parties stipulated that, among the class members opting out, were the following: 350 class members and spouses represented by the Robins, Kaplan, Miller and Caraways law firm in Minneapolis, Minnesota; 500 class members and spouses represented by the Capretz & Kasden law firm in Irvine, California; and 67 class members and spouses represented by the Robles & Gonzalez law firm in Miami, Florida.

that was brought prior to the commencement of this action. Public Citizen asserts that Johnson is seeking compensation for these hours based upon the theory that his work in the Texas case forced defendants into the global settlement of this case. Public Citizen does not believe that this theory supports his recovery for those hours in this case, particularly in light of the fact that Mr. Johnson may have settled the Texas case and would, therefore, have already been compensated for his work there. Thus, Public Citizen asserts that none of Mr. Johnson's time in 1987, 1988, 1989, 1990 and 1991 is compensable from the common fund in this case.

After deducting these hours, Public Citizen calculates Johnson's individual lodestar, enhanced by a blended multiplier of 1.3,[25] as $1,369,516.80, plus expenses of $40,248.53. As to his English co-counsel, Alexander Harris & Co., Public Citizen asserts that only 230 hours, or 33.4% of its claimed 748.89 hours, are properly compensable, which yields an enhanced lodestar of $57,568.51. Thus, Mr. Johnson's total enhanced lodestar, including expenses, is, according to Public Citizen, $1,479,372.90.

### 3. *Special Counsel Lewis Saul*

Public Citizen recommends a small reduction of 25 hours because of some minor duplication in Mr. Saul's claimed hours. Based upon this reduction, Public Citizen calculates Mr. Saul's lodestar, including Mr. Okkerse's hours, as $347,776.25. Multiplying this figure by a blended multiplier of 1.3, Public Citizen calculates Mr. Saul's enhanced lodestar as $452,109.12. As for his claimed expenses of $10,773.17, Public Citizen asserts that only $8,000.00 of these expenses can be justified. Thus, Public Citizen recommends a total award to Mr. Saul of $460,109.12.

### 4. *Special Counsel Charles Wolfson*

Public Citizen finds all of Mr. Wolfson's claimed 286.6 hours reasonable. Because Mr. Wolfson does not state his hourly rate in the application, Public Citizen assigns him an hourly rate of $250.00 and calculates his lodestar as $68,067.50. Public Citizen employs a blended lodestar of 1.25, which it asserts takes account of the fact that approximately half of Mr. Wolfson's hours were spent prior to approval of the settlement and half after. Thus, Public Citizen recommends a total award of $95,434.38, based upon an enhanced lodestar of $85,084.38 plus expenses of $10,-350.00.

### 5. *Special Counsel Brian Magaña*

Because Mr. Magaña and his Dutch co-counsel, Jan Beer, have not itemized their hours, Public Citizen does not calculate a lodestar for Mr. Magaña. Public Citizen characterizes Mr. Magaña's role in this case as "relatively modest" and asserts that it would be inappropriate to increase Counsel's overall fee award by anything more than $50,000.00 to account for Mr. Magaña's and Mr. Beer's work.

### 6. *Special Counsel James T. Capretz*

Public Citizen, finding all of Mr. Capretz's claimed hours reasonable and well documented, calculates his lodestar as $430,586.00. Suggesting a multiplier of 1.75 [26] for all of the hours expended by Mr. Capretz and his firm prior to approval of the settlement, and a very minimal multiplier of just over one for those hours expend after approval of the settlement, Public Citizen calculates an enhanced lodestar of $683,408.00. Adding to this figure Mr. Capretz's claimed expenses of $63,005.06, Public Citizen arrives at a total award for Mr. Capretz of $746,413.06.

Thus, the total maximum fee that could be properly awarded to Class and Special Coun-

---

**25.** In choosing this blended multiplier, Public Citizen reasons that objectors, including itself, should receive a more modest multiplier of 1.5, as compared to Class Counsel's multiplier of 2.0, for work performed prior to the approval of the settlement because the objectors did not assume as much risk as Class Counsel. For work done after approval of the settlement, Public Citizen believes that little or no multiplier is warranted, given that there was very little risk of non-payment at that point. Thus, Public Citizen's choice of 1.3 as a blended multipli-

er for Johnson reflects its conclusion that more of Johnson's hours are for pre-approval work than for post-approval work.

**26.** Public Citizen contends that Mr. Capretz and his former firm took a greater risk in advancing out-of-pocket expenses than did the other objectors. It therefore employs a multiplier of 1.75 for Capretz's pre-approval work to account for this extra risk.

sel on their joint application, according to Public Citizen, is $11,081,329.46, broken down as follows:

| | | | |
|---|---|---|---|
| Class Counsel | – | $ 8,250,000.00 | (5% of common fund) |
| John Johnson | – | 1,479,372.90 | (enhanced lodestar) |
| Lewis Saul | – | 460,109.12 | (enhanced lodestar) |
| Charles Wolfson | – | 95,434.38 | (enhanced lodestar) |
| Brian Magaña | – | 50,000.00 | (estimate) |
| James Capretz | – | 746,413.06 | (enhanced lodestar) |
| **TOTAL** | – | **$11,081,329.46** | |

### C.  *Public Citizen, Inc.'s Fee Application*

Public Citizen seeks a total award of $105,-037.46 based upon an enhanced lodestar of $99,070.30 and total expenses of $5,967.16. In support of its request, Public Citizen shows that its attorneys have expended a total of 355.10 hours on this case at hourly rates ranging from $180.00 to $300.00. Public Citizen applies a multiplier of 1.5 to the hours that its attorneys expended prior to the Court's approval of the settlement, a multiplier of 1.1 for those hours expended while the appeals were pending and no multiplier for hours expended after the settlement became final and unappealable.

According to its application, Public Citizen has been at the forefront of bringing the problems associated with the c/c heart valve to light.  It brought suit against defendants in California, petitioned the FDA to require defendants to notify implantees and their physicians of the risk of fracture and negotiated the terms of the notification program with the defendants.  Furthermore, through its clearinghouse, Public Citizen assisted dozens of lawyers in bringing suit against defendants by creating a paper trail of liability that lawyers around the nation utilized.

Public Citizen's participation in this case has included numerous objections to the settlement, participation in the negotiations that led to the enhanced settlement, work with the Supervisory Panel and objections to the applications for attorneys' fees currently before the Court.  No objections to Public Citizen's application have been filed.

### D.  *Application for an Award of Costs by The Consumentenbond*

The Consumentenbond, a Dutch non-profit consumer advocate organization, has filed an application seeking an award of $197,675.00. According to its application, this figure represents its estimated in-house costs to date in dealing with all of the problems related to the c/c heart valve and the settlement based upon an analysis by its in-house controller.

According to its application, The Consumentenbond has been working on the c/c heart valve problem since 1985, spending thousands of hours handling questions and matters relating to the approximately 2,617 valves that have been implanted in 2,303 Dutch patients.  After it became aware of the full scope of the problems with the valve, The Consumentenbond petitioned the Dutch Government to commission a study to determine which valves were most likely to fracture and what the best course of action would be.  The Dutch Government ultimately commissioned a study, which was published in the English medical journal, *The Lancet,* and the FDA subsequently required the defendants to send a copy of the study to all doctors who were treating patients implanted with the valves.

After approval of the settlement in 1992, The Consumentenbond acted as an information conduit between the United States parties and Dutch implantees.  It continued in this capacity after approval of the settlement, providing its members with updated information about the research being done and the recent developments over the issue of single-leg fractures.  Finally, it assisted its members in filling out the various claim forms required for participation in the settlement.

Public Citizen objects to The Consumentenbond's application asserting that, although its work is admirable, its expenses are not documented, are based solely upon estimates and, in large part, relate to work done as far back as 1985.  Public Citizen also points out that The Consumentenbond does not reveal whether it received compensation for its expenses from other sources.  Thus, although The Consumentenbond might be entitled to a modest award if it could properly document its expenses relating directly to this case, Public Citizen objects to any award without proper documentation.

On September 12, 1995, The Consumentenbond filed, in response to Public Citizen's objection, an affidavit by its Legal Counsel setting forth that $106,500.00 of its estimated

$197,675.00 in in-house costs were incurred after it received notice of this case in January, 1992. These costs break down as follows:

| | | |
|---|---|---|
| Personnel, Legal and Administrative | – | $ 80,000.00 |
| Office Supplies Related to This Case | – | 20,000.00 |
| Communication Costs (faxes, mailing and shipping, documents to members) | – | 6,500.00 |
| Total Estimated In-House Costs Incurred After January, 1992 | – | $106,500.00 |

In response to this filing, Public Citizen notes that, although the affidavit does provide some useful additional information, The Consumentenbond's use of rough estimates in lieu of detailed documentation of its expenses makes it extremely difficult to determine how much of its costs are compensable in this case. Accordingly, Public Citizen requests that the Court exercise its discretion and reduce any award made to The Consumentenbond to reflect the lack of detail in its application.

### E. *Application of Thomas K. Herren, Esq.*

Mr. Herren represented a class member named Michael Zehender and seeks an award of $6,884.00 for that representation. According to his affidavit, Mr. Herren began representing Mr. Zehender on July 11, 1991. The affidavit further reflects that Mr. Herren's work was done for Mr. Zehender individually rather than on behalf of the Class.

Because Mr. Herren's work was done for his client, rather than the Class, Public Citizen objects to his application. Mr. Herren's services did not confer any benefit upon the plaintiff class; thus, he is not, according to Public Citizen, entitled to an award from the common fund in this case.

### F. *Affidavit of Guy N. Perenich, Esq. for Attorney's Fees*

Mr. Perenich seeks an award of $2,116.00 for his representation of a class member and his wife in this case. Perenich's amended affidavit reflects that all of his work was done on behalf of his clients rather than on behalf of the plaintiff class.

Public Citizen objects to Mr. Perenich's application on the ground that he never entered an appearance in this case or filed an objection to the settlement. Thus, Public Citizen asserts that Mr. Perenich had nothing to do with creating or enhancing the settlement fund and thus is not entitled to an award therefrom.

## VI. *DISCUSSION*

### A. *Fee Awards in a Common Fund Case*

■ The settlement of this case clearly resulted in a fund (composed of the Patient Benefit, Consultation and Spousal Compensation Funds) for the common benefit of the settlement class. "[A] litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980). This doctrine, known as the "common-fund doctrine", derives from a federal court's "historic equity jurisdiction", *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 164, 59 S.Ct. 777, 779, 83 L.Ed. 1184 (1939), and is premised upon the principle "that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense." *Boeing*, 444 U.S. at 478, 100 S.Ct. at 749. Accordingly, those attorneys and organizations who contributed to the creation of the common fund in this case are entitled to a reasonable fee therefrom.

■ When an attorney makes a claim for fees from a common fund, his interest is "adverse to the interest of the class in obtaining recovery because the fees come out of the common fund set up for the benefit of the class." *Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir.1993). This divergence of interests requires a court to assume a fiduciary role in reviewing fee applications because "there is often no one to argue for the interests of the class (that their recovery should not be unfairly reduced), since it is to be expected that class members with small individual stakes in the outcome will not file objections, and the defendant who contributed to the fund will usually have scant interest in how the fund is divided between the plaintiffs and class counsel."

*Rawlings,* 9 F.3d at 516. (footnote omitted).[27] The court's responsibility is only heightened where, as here, the common fund results from a pre-certification settlement:

> [T]he divergence in financial incentives present here "creates the danger that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees" ... This generates an especially acute need for close judicial scrutiny of fee arrangements that implicate this concern. (citations and alterations omitted)

*In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 821 (3rd Cir.1995) (*quoting Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518, 524 (1st Cir.1991)), *cert. denied,* — U.S. ——, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995).

## B. Selecting the Method of Award

■ Although the preferred method of award in common fund cases has historically been to award a reasonable percentage of the fund,[28] this approach fell into disfavor during the 1970s because it was thought to frequently yield fee awards that were excessive and unrelated to the work actually performed. *Court Awarded Attorney Fees, Report of the Third Circuit Task Force,* 108 F.R.D. 237, 242 (1986) ("*Third Circuit Report*"). Led by the Third Circuit's decision in *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 167–68 (3rd Cir.1973), courts began with increasing frequency to use the lodestar approach to calculate fee awards in common fund cases. *See e.g., Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1265–66 (D.C.Cir.1993); *Third Circuit Report,* 108 F.R.D. at 242.

The lodestar method requires a court to calculate the product of an attorney's reasonable hours expended and reasonable hourly rate. The lodestar calculation can then be adjusted upward or downward, through application of a "multiplier", to account for additional factors such as the contingent nature of the case and the quality of an attorney's work. *Shalala,* 1 F.3d at 1266; *Third Circuit Report,* 108 F.R.D. at 242.

Two developments in the 1980s, however, marked a reversal in the trend toward the lodestar method. The first was a footnote in a 1984 Supreme Court decision suggesting that an award in a common fund case should be based upon a percentage of the fund:

> Unlike the calculation of attorney's fees under the "common fund doctrine," where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation.[29]

*Blum v. Stenson,* 465 U.S. 886, 900, n. 16, 104 S.Ct. 1541, 1549 n. 16, 79 L.Ed.2d 891 (1984). The second was a report issued by the Task Force appointed by the Third Circuit to evaluate the practical effectiveness of the lodestar method in making fee awards. *Third Circuit Report, supra.* The Task Force noted nine different deficiencies that had been leveled against the lodestar approach:

1) It "increases the workload of an already overtaxed judicial system";

2) Its elements "are insufficiently objective and produce results that are far from homogenous";

---

27. *See also Skelton v. General Motors Corp.,* 860 F.2d 250, 253 (7th Cir.1988) (in a common fund case, "[t]he court becomes the fiduciary for the fund's beneficiaries and must carefully monitor disbursement to the attorneys by scrutinizing the fee applications."), *cert. denied,* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989).

28. *See Central R.R. & Banking Co. v. Pettus,* 113 U.S. 116, 128, 5 S.Ct. 387, 393, 28 L.Ed. 915 (1885) (awarding fees based upon percentage of fund recovered for the benefit of the class); *Third Circuit Report,* 108 F.R.D. 237,

242 (1986); *Arenson v. Board of Trade of City of Chicago,* 372 F.Supp. 1349, 1357 n. 14 (N.D.Ill.1974) (listing cases in which courts based awards upon a percentage of the fund).

29. This statement is in keeping with the Supreme Court's previous decisions dealing with awards of attorneys' fees in common fund cases. *See e.g., Sprague v. Ticonic National Bank,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); *Central R.R. & Banking Co. v. Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885).

3) It "creates a sense of mathematical precision that is unwarranted in terms of the realities of the practice of law";

4) It "is subject to the manipulation of the judges who prefer to calibrate fees in terms of percentages of the settlement fund or the amounts recovered by the plaintiffs or of an overall dollar amount";

5) Although designed to curb certain abuses, it has led to other abuses, such as "encouraging lawyers to expend excessive hours engag[ing] in duplicative and unjustified work, inflat[ing] their 'normal' billing rate, and includ[ing] fictitious hours";

6) It "creates a disincentive for the early settlement of cases";

7) It "does not provide the district court with enough flexibility to reward or deter lawyers so that desirable objectives, such as early settlement, will be fostered";

8) It "works to the particular disadvantage of the public interest bar" because "the 'lodestar' in the so-called 'money' cases, such as securities and antitrust actions, are set higher than they are in the Civil Rights Attorneys Fees Awards Act of 1976";

9) "Despite the apparent simplicity of the [lodestar] formulation, considerable confusion and lack of predictability remain in its administration."

*Third Circuit Report,* 108 F.R.D. at 246–49. Characterizing the lodestar approach as a "cumbersome, enervating, and often surrealistic process of preparing and evaluating fee petitions that now plagues the bench and bar", *id.* at 258, the Task Force recommended that the lodestar method be retained in fee-shifting statute cases but abandoned in favor of a negotiated percentage of the fund in common fund cases. *Id.* at 255–56.

Today, the clear trend among courts making awards in common fund cases is to award a reasonable percentage of the fund. *See e.g., In re Chrysler Motors Corp. Overnight*

*Evaluation Program Litigation,* 736 F.Supp. 1007, 1009, 1016 (E.D.Mo.1990) (describing this trend as "healthy" and listing cases); *Swedish Hosp. Corp.,* 1 F.3d at 1267 (noting the trend and listing cases). The Third Circuit, for example, has recently held that the percentage-of-the-fund method is generally the preferable method in common fund cases with a lodestar analysis perhaps being employed to cross check the propriety of the award. *See General Motors,* 55 F.3d at 821. Two circuits have gone farther, eschewing the lodestar approach in common fund cases entirely and requiring that an award in such cases be based upon a reasonable percentage of the fund. *See Swedish Hosp. Corp.,* 1 F.3d at 1271; *Camden I Condominium Ass'n, Inc. v. Dunkle,* 946 F.2d 768, 774 (11th Cir.1991).

■ Although the Sixth Circuit has acknowledged this trend, it "require[s] only that awards of attorney's fees in common fund cases be reasonable under the circumstances." *Rawlings,* 9 F.3d at 516 (*citing Smillie v. Park Chem. Co.,* 710 F.2d 271, 275 (6th Cir.1983)). The Sixth Circuit thus leaves it to the district court to choose the method that best accounts for the exigencies of the particular case before it:

> When awarding attorney's fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved.... The lodestar method better accounts for the amount of work done, while the percentage of the fund method more accurately reflects the results achieved. For these reasons, it is necessary that district courts be permitted to select the more appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them.

*Id.* (citations omitted).[30] The court must, however, "provide a clear statement of the

---

**30.** *See also In re Washington Public Power Supply System Securities Litigation,* 19 F.3d 1291, 1295 (9th Cir.1994); *Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518, n. 10 (1st Cir.1991); *Harman v. Lyphomed, Inc.,* 945

F.2d 969, 974–75 (7th Cir.1991); *Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454 (10th Cir.1988), *cert. denied,* 488 U.S. 822, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988), all holding, either expressly or impliedly, that it is within a

reasoning used in adopting a particular methodology and the factors considered in arriving at the fee." *Id.*

■ For all of the reasons set forth in the Third Circuit Task Force's Report, the Court will base Class and Special Counsel's award upon a percentage of the fund. The Court's choice of a percentage, however, will be heavily informed by the value of the services rendered by Counsel. This approach affords the Court greater flexibility in assuring that Counsel are adequately compensated for the results that they have achieved and the work that they have done, while also protecting the Class' interest in the fund. Counsel settled this case early and favorably, and strict application of the lodestar analysis may not fully compensate them for the benefit that they have conferred upon the Class. On the other hand, the percentage awarded must bear some relationship to the work that Counsel have done and the work that they will do under the settlement.

A complete lodestar analysis of Counsel's joint application would, moreover, likely require a "second major litigation".[31] For example, Special Counsel John Johnson's entitlement to compensation for his work prior to this case poses a difficult question. There is circuit authority suggesting that an attorney's work in a related, prior case may be compensable from the common fund created by the global settlement of a subsequent case if the lawyer's work in the previous case contributed to (i.e. "set the table for") the subsequent settlement. *See Gottlieb v. Barry,* 43 F.3d 474, 489 (10th Cir.1994). Proceeding strictly on a lodestar basis would thus require the Court to resolve this and other difficult and contentious evidentiary issues at great expense and inconvenience to the Court and the parties alike. For these reasons, the Court will employ the percentage-of-the-fund method in setting Counsel's award.

court's discretion to choose the appropriate method of award.

**31.** The Supreme Court has held that a request for attorney's fees should not result in a "sec-

### C. Calculating Class and Special Counsel's Award

■ The Sixth Circuit has held that the following factors are relevant to a court's assessment of attorneys' fees:

(1) the value of the benefit rendered to the plaintiff class (i.e. the results achieved);

(2) the value of the services on an hourly basis;

(3) whether the services were undertaken on a contingent fee basis;

(4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others;

(5) the complexity of the litigation; and

(6) the professional skill and standing of counsel involved on both sides.

*See Rawlings,* 9 F.3d at 516–17; *Smillie v. Park Chemical Co.,* 710 F.2d 271, 275 (6th Cir.1983); *Ramey v. Cincinnati Enquirer, Inc.,* 508 F.2d 1188, 1196 (6th Cir.1974), *cert. denied,* 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975). Most important among these factors are the value of the benefit rendered to the plaintiff class and the value of Counsel's services on an hourly basis. *Rawlings,* 9 F.3d at 516 ("When awarding attorney's fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved."); *Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 640 F.Supp. 697, 700 (S.D.Ohio 1986) (Spiegel, J.) (noting that the value of the benefit rendered is the first factor listed because it is most important). In applying these factors to Counsel's application, the Court reaches the following conclusions.

### 1. Value of the Benefit Rendered to the Class

The value of the common fund created by the settlement of this case clearly is not, as Class and Special Counsel contend, $165 million. As previously set forth, the settlement does not require defendants to begin paying the final $37.5 million into the Patient Benefit

ond major litigation." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983).

Fund until the year 2000, with their final annual payment not due thereunder until the year 2005.[32] Consideration of the time value of money thus leads inexorably to the conclusion that the present-day value of the common fund is something less than its nominal value of $165 million.[33]

The nominal value of the common fund, moreover, may be something less than $165 million because only $37.5 million of the Patient Benefit Fund is guaranteed under the settlement. After contributing a total of $37.5 million into the Fund, which is not scheduled to occur until 1999, defendants are entitled to go before the Court and argue that their payment of the remaining $37.5 million is not warranted.[34] If defendants are successful in their argument, then the Patient Benefit Fund will total only $37.5 million and the total nominal value of the common fund will be $127.5 million. It is, then, more accurate to say that the nominal value of the common fund may range anywhere from $127.5 million to $165 million, depending upon defendants' ultimate contribution to the Patient Benefit Fund.

This is not to suggest, however, that the settlement does not confer a substantial benefit upon the Class; clearly it does. The present value of the common fund, while less than $165 million, indisputably exceeds $100 million (the fund presently totals approximately $102.5 million [35]). Furthermore, the settlement offers class members substantial benefits beyond the common fund, including the Fracture Compensation Mechanism and Class Counsel's commitment to represent class members whose valves suffer a single-leg fracture and individually negotiate settlements on their behalf.

### 2. The Value of Counsel's Services on an Hourly Basis

The value of Counsel's services on an hourly basis, while significant, is simply not commensurate with their fee request. Even including every hour listed by Class and Special Counsel, their combined, unadjusted lodestar totals $4,945,022.42,[36] which is just 15% of their $33 million request.[37]

Concededly, this lodestar figure does not include the future work to which Counsel have committed under the settlement. All parties, including Public Citizen, agree that Class and Special Counsel likely face a significant amount of work in the future as the various programs under the settlement are carried out. There is, however, simply no reliable way of predicting either the amount or type of services that will be required of Counsel in the future. Certainly, the work that Counsel have done since approval of the settlement does not suggest that their future work will be substantial enough to justify $33 million in fees. Because the future legal services required of Counsel is so to difficult measure, the Court does not deem it appropriate to make a present award to Counsel that includes compensation for services they have yet to render.

### 3. Society's Stake in Rewarding Attorneys Who Produce Such Benefits

Clearly, the global settlement negotiated by Counsel in this case is providing benefits

32. See supra Part IV.

33. All parties agree that the Class in this case is shrinking at a rapid rate due to the average age and health of class members. The utility of defendants' final payments into the Patient Benefit Fund is, therefore, questionable; there will be very, very few class members alive in these years to benefit from the payments.

34. See supra Parts III.A and IV. Given that there will likely be relatively few class members remaining in the year 2000, see supra n. 33, it is not difficult to anticipate the argument that defendants are likely to make.

35. The figure is exclusive of interest earned, which is substantial, and is calculated as follows: $80 million for the Consultation Fund, $10 million for the Spousal Consultation Fund and the first payment of $12.5 million into the Patient Benefit Fund.

36. This figure includes all of Counsel's claimed expenses and hours, including Class Counsel's "staff" hours and Mr. Johnson's hours dating back to March 1, 1987. The figure also includes an estimated fee of $50,000.00 for Brian Magaña and, with the exception of Mr. Wolfson, is based upon the hourly rates set forth in the application. Borrowing from Public Citizen's analysis, the Court assumed an hourly rate of $250.00 for Mr. Wolfson.

37. Counsel's request thus implies a multiplier of 6.67.

to a class of people who are very much in need of help. Implantees around the world have been living with the fear that, at any moment, they could drop dead from the fracture of the very prosthetic device that was put in their bodies to save their lives. The only organized research on the valve was being carried out by defendants, and they have never even acknowledged that there is a problem with the valve. Furthermore, a fracture victim's only option for seeking compensation was to hire a lawyer and bring suit, and even this option was probably unavailable in many countries around the world. The settlement goes a long way toward addressing these concerns and is something that society clearly has a stake in rewarding.

The Court is not, however, persuaded by Counsel's contention that this case was particularly undesirable when it was undertaken.[38] Although plaintiffs with functioning valves had not been particularly successful with their claims for emotional distress and fraud, there were many lawyers around the country and around the world willing to take these cases.

### 4. Whether the Services Were Undertaken on a Contingent Fee Basis

Class Counsel undertook this case in 1991 on a contingent basis and, to date, has not been compensated for his services or reimbursed for the out-of-pocket expenses that he and his firm have advanced. Special Counsel's work as objectors was also contingent; had they been successful in their efforts to get the Court to reject the settlement, their work in this case, ironically, would have gone uncompensated. As Public Citizen has pointed out, however, Special Counsel, in their role as objectors, did not take on nearly as much risk as Class Counsel did in bringing this action. Class Counsel made a much more substantial investment of time and expenses at the beginning of this case knowing that payment for this investment was completely contingent upon a recovery for the plaintiffs.

Of course, following approval of the settlement, the risk of non-recovery, and therefore the contingent nature of Counsel's work, dropped dramatically and ultimately disappeared upon the dismissal of the final appeal. There is, therefore, no contingency associated with the future work that Counsel expect to do under the settlement.

### 5. The Complexity of the Litigation

Counsel were confronted with myriad complex legal and factual questions in bringing this action and in negotiating the settlement. The structure of the settlement agreement approved by the Court reflects this fact.

### 6. The Professional Skill and Standing of Counsel Involved on Both Sides

The professional skill and standing of both Class and Special Counsel is very high and no doubt had much to do with their ability to successfully negotiate the settlement agreement and then get it approved by the Court. Class Counsel is a leading attorney in the mass-tort arena and Special Counsel have extensive experience both in general product liability litigation and in litigating c/c heart valve cases. Likewise, the skill and standing of defendants' counsel in this case is very high.

### 7. Additional Factors

In addition to the factors set out by the Sixth Circuit, the Court also finds the following two factors relevant to the unique circumstances of this case: (1) the time in which the result was obtained, and (2) the economies of scale involved in prosecuting a class action. See e.g., In re Domestic Air Transp. Antitrust Litigation, 148 F.R.D. 297, 352 (N.D.Ga.1993) (citing Camden I Condominium Ass'n, Inc. v. Dunkle, 946 F.2d 768, 775 (11th Cir.1991)).

Settlement in this case occurred very early in the proceedings and before the Court had ruled on the several motions before it. Thus, in view of the complexity of this litigation and the scope and comprehensive nature of the

---

38. Implicit in this factor, the Court believes, is the question of the case's "undesirability"; society has a more significant stake in assuring that cases which are important but which are not, from a lawyers' perspective, particularly desirable, are nevertheless undertaken. See Northcross v. Board of Ed. of Memphis City Schools, 611 F.2d 624, 642 (6th Cir.1979), cert. denied, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980).

settlement, it is clear that Counsel settled this case in swift and efficient fashion. At least some of the speed with which settlement was reached, however, must be attributed to the extensive work that had been done prior to this case by countless attorneys and organizations like Public Citizen and even the United States Congress. This work clearly facilitated Class Counsel's early settlement of this case.

Finally, the economies of scale present in a class action of this size suggest that an award of 20% of the fund would be highly excessive. Courts have recognized that the economies of scale present in a class action, particularly a large class action, must be taken into consideration when making an award to plaintiffs' counsel because the additional incremental time and effort required to litigate a large class action is relatively small. *See e.g., Camden I Condominium Ass'n,* 946 F.2d at 775; *Domestic Air Transp. Antitrust Litigation,* 148 F.R.D. at 297; *Mashburn v. National Healthcare, Inc.,* 684 F.Supp. 679, 695 (M.D.Ala.1988). Thus, an attorney who achieves a quick result in a class action should not be permitted to receive a contingent fee payable out of the entire fund at the same rate as an attorney bringing a single claim. *Domestic Air Transp. Antitrust Litigation,* 148 F.R.D. at 297; *Mashburn,* 684 F.Supp. at 695.

In sum, neither the value of the settlement nor the value of Class and Special Counsel's services on an hourly basis support their request for $33 million. The settlement clearly offers substantial and valuable benefits to the Class; however, much of its value is deferred into the future and is contingent upon the occurrence of certain events. Likewise, the value of Counsel's services, while not insubstantial, is not even remotely commensurate with their fee request, and the value of the future services which they expect to render is impossible to determine with any certainty. These two most critical factors, as well as the economies of scale present in this litigation, clearly suggest that a far more modest award is in order. As the district court observed in *Domestic Air Transp. Antitrust Litigation:*

[W]hen the fund is extraordinarily large, the application of a normal range of fee awards may result in a fee that is unreasonably large for the benefits conferred. Thus, based on empirical research covering settlements as late as 1991, Newberg notes that percentage awards tend to decline as the size of the recovery increases. Herbert P. Newberg, *Attorney Fee Awards* § 2.09 (1986). Where fund recoveries range from $51–$75 million, fee awards usually fall in the 13–20% range ... In megafund cases where extraordinarily large class recoveries of $75–$200 million and more are recovered, courts most stringently weigh the economics [sic] of scale inherent in class actions in fixing an appropriate per cent recovery for reasonable fees. Id. Accordingly, fees in the range of 6–10% and even lower are common in this large scale context. (emphasis added)

*Domestic Air Transp. Antitrust Litigation,* 148 F.R.D. at 350–51 (footnotes omitted).

The remaining factors, on the other hand, generally support Counsel's application. Counsel's compensation in this case, particularly Class Counsel's, was completely contingent upon recovery for the Class, and Counsel have had to wait for a period of years for payment for the services which they have rendered in this case. Furthermore, the legal and factual issues underlying this case were very complex, the professional skill and standing of counsel on both sides is considerable and Class and Special Counsel were able to obtain a favorable settlement early in this case.

### 8. *Counsel's Award*

Taking all of these factors into account, the Court will award Class and Special Counsel 10% of the common fund, plus expenses, structured in the following manner. Counsel will receive an immediate payment of $10.25 million in fees from the common fund, which represents 10% of the $102.5 million that has been paid into the common fund to date. Counsel will also receive an immediate payment of $476,938.06 as reimbursement for the expenses which they have incurred in this case. This expense figure reflects a full award of expenses to all Counsel except John Johnson, who is entitled to reimbursement of

only $40,248.53 of his $273,799.95 in claimed expenses. The remaining $233,541.42 relate to expenses that Mr. Johnson and his English co-counsel incurred in other, prior cases and, as a result, are not recoverable from the common fund in this case.

Furthermore, Counsel will be entitled, subject to the conditions set forth below, to up to 10% of the defendants' annual payments into the Patient Benefit Fund, plus expenses, for so long as defendants make these payments. If, at any point, the defendants cease paying into the Fund, then Counsel's entitlement to a fee therefrom shall also cease.

In structuring Counsel's award in this manner, the Court will utilize the mechanism that has already been put in place to administer the settlement—the Special Masters/Trustees. The Trustees will make an immediate payment to Counsel of $10.25 million, which represents 10% of the $80 million Medical and Psychological Consultation Fund, 10% of the $10 million Spousal Compensation Fund and 10% of the $12.5 million that has been paid into the Patient Benefit Fund. Likewise, the Trustees will also make immediate payment of $476,938.06 to Counsel as reimbursement for their expenses. Thereafter, in each year that defendants pay into the Patient Benefit Fund as provided in the settlement, Counsel may apply to the Trustees for up to 10% of that payment, plus expenses, within 30 days of its receipt by the Trustees. Counsel shall simultaneously file a copy of their application with this Court,[39] the attorney of record for defendants and Public Citizen, and the application shall set forth the amount and nature of work which they have performed since their last application, as well as a statement as to whether they have performed all of the duties to which they have committed under the settlement. The following parties may file an objection to the application within 20 days of the filing of Counsel's application with the Trustees: a class member, the defendants, Special Counsel and any party permitted by the Court to participate as *amicus curiae* in this case. Any such objection shall be filed simultaneously with the Trustees and this Court. Thereafter, the Trustees shall file a written report and recommendation to this Court indicating whether Counsel's application should be granted in whole or in part, or denied. Upon receipt of the Trustee's recommendation and report, the Court will ultimately determine whether Counsel's application should be granted in whole or in part, or denied, and enter an order accordingly.

Although novel, the fee structure chosen by the Court is consistent with the structure of the settlement. The present award of $10.25 million fairly compensates Counsel for the work that they have actually done, as well as the benefits that they have actually conferred upon the Class. This portion of the award also reflects the legal and factual complexity of this case, the standing of counsel on both sides and the contingency that Counsel undertook in bringing this action. Likewise, the future portion of Counsel's award will fairly compensate Counsel for the future work that they will do and the benefits that they will confer upon the Class at or near the time that this work is actually done and these benefits are actually conferred upon the Class. This portion of the award also reflects the complexity of this case, the standing of counsel and the contingency undertaken at the outset of this case.

The Court's fee structure thus links Counsel's award to the money that is actually paid into the common fund over the life of the settlement and assures that their award reflects both the present value and the ultimate nominal value of the fund. Furthermore, the fees that are deferred into the future assure that Counsel will be compensated for their future services as they provide them to the Class. .

In contrast, Counsel's request for the payment of $33 million up front and in full is inconsistent with the structure of the settlement and unjustified by the work done in this case. Simply stated, $33 million is entirely too much money for legal fees given the facts and circumstances of this case.

---

39.    All matters relating to Counsel's future fee applications in this case shall be directed to, and decided by, the Honorable S. Arthur Spiegel or his successor.

### D. *The Remaining Applications*

#### 1. *Public Citizen*

■ Public Citizen's request for an award of $105,037.46 is fully justified by the work that it has done in this case. Its extensive objections to the fee applications before the Court have been invaluable. Likewise, its objections to the settlement, its participation in the negotiation process and its participation in the implementation of the settlement have been very beneficial to the Class. The lack of an objection to Public Citizen's application is reflective of the fact that $105,037.46 for the services that it has provided in this case is a bargain for the Class. Accordingly, the Court will order that the Trustees pay $105,037.46 to Public Citizen from the common fund.

#### 2. *The Consumentenbond*

■ The Consumentenbond has not provided the Court with any documentation of its expenses, relying instead upon estimates by its in-house controller. Furthermore, it has not demonstrated a sufficient nexus between its estimated expenses and the benefit conferred upon the Class. Although its activities may have benefited certain class members in Holland, it has not demonstrated that any of its expenses were incurred for the benefit of the Class as a whole. Accordingly, its application for expenses will be denied.

#### 3. *Thomas K. Herren, Esq.*

■ It is apparent from Mr. Herren's application that he has done an admirable job in representing his client, who is a member of the Class in this case. This representation clearly did not, however, render any benefit to the Class. As a result, he is not entitled to a fee from the common fund and his application will therefore be denied.

#### 4. *Guy N. Perenich, Esq.*

■ Similarly, it appears from Mr. Perenich's affidavit that he has done an admirable job in representing his clients, who are both members of the Class. This representation did not, however, render any benefit to the Class. As a result, he is not entitled to a fee from the common fund and his application will therefore be denied.

### VII. *CONCLUSION*

Based upon the foregoing,

**IT IS HEREBY ORDERED** that Class and Special Counsel's joint application for attorneys' fees and expenses be and is granted in part and denied in part. The Special Masters/Trustees appointed to administer the settlement in this case shall immediately pay to Class and Special Counsel $10.25 million from the Medical and Psychological, Patient Benefit and Spousal Compensation Funds. The Special Masters/Trustees shall also immediately pay to Class and Special Counsel $476,938.06 as reimbursement for the expenses which they have incurred in this case. Payment of all fees and expenses from these funds shall be on a *pro rata* basis.

**IT IS FURTHER ORDERED** that, as further compensation for Class and Special Counsel's fees and expenses, the Special Masters/Trustees shall pay, in conformity with the procedure set forth above in this Memorandum, annual fee payments and expenses to Class and Special Counsel from the Patient Benefit Fund.

**IT IS FURTHER ORDERED** that the application of Public Citizen, Inc., for attorneys' fees and expenses be and is granted in full. The Special Masters/Trustees shall pay $105,037.46 to Public Citizen, Inc., from the Medical and Psychological, Patient Benefit and Spousal Compensation Funds on a *pro rata* basis.

**IT IS FURTHER ORDERED** that the application of The Consumentenbond for an award of costs be and is denied.

**IT IS FURTHER ORDERED** that the application of Thomas K. Herren, Esq., be and is denied.

**IT IS FURTHER ORDERED** that the application of Guy N. Perenich, Esq., be and is denied.